```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                   SPRINGFIELD DIVISION

 3                               )
 4   IN RE SPRINGFIELD GRAND     ) CASE NO. 15-MC-3005
     JURY ███████████           ) SPRINGFIELD, ILLINOIS
 5                               )

 6

 7              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE SUE MYERSCOUGH
 8             UNITED STATES DISTRICT JUDGE

 9   JULY 28, 2015

10   A P P E A R A N C E S:

11

12   FOR THE GOVERNMENT:         TIMOTHY BASS
                                 PATRICK HANSEN
13                               U.S. ATTORNEY'S OFFICE
                                 318 S. SIXTH STREET
14                               SPRINGFIELD, ILLINOIS

15   FOR MR. SCHOCK:             GEORGE J. TERWILLIGER, II
                                 NICHOLAS LEWIS
16                               CHRISTINA EGAN
                                 MCGUIRE WOODS, LLP
17                               2001 K. STREET NW
                                 WASHINGTON, DC
18                                    AND
                                 JEFFREY LANG
19                               LANE & WATERMAN, LLP
                                 220 N. MAIN STREET
20                               DAVENPORT, IA

21

22

23

24   COURT REPORTER:     KATHY J. SULLIVAN, CSR, RPR, CRR
                         OFFICIAL COURT REPORTER
25                       600 E. MONROE
                         SPRINGFIELD, ILLINOIS
                         (217)492-4810
```

1                              I N D E X

2       WITNESS                 DIRECT  CROSS   REDIRECT   RECROSS
        BERNARD COLEMAN           56     64     69/74        72
3       FRANK H. MACKAMAN         78    102
        KAREN HANEY              122
4

5

6

7

8                          E X H I B I T S

9       NUMBER                     IDENTIFIED       ADMITTED

10      GOVERNMENT EXHIBIT B          48

11      SCHOCK EXHIBIT 4             101              102
        SCHOCK EXHIBIT 5              82               83
12      SCHOCK EXHIBIT 6              89               90
        SCHOCK EXHIBIT 7             89               92
13      SCHOCK EXHIBIT 8             89
        SCHOCK EXHIBIT 9             94
14      SCHOCK EXHIBIT 10            97               97
        SCHOCK EXHIBIT 25          142              142
15      SCHOCK EXHIBIT 26          142              142
        SCHOCK EXHIBIT 28          127              128
16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        *    *    *    *    *    *    *    *    *    *    *

 3            THE COURT:  This is 15-MC-3005, in re Grand

 4   Jury investigation.  Cause is called for hearing.

 5        We have for the Government Patrick Hansen,

 6   First Assistant U.S. Attorney.  Mr. Timothy Bass,

 7   Assistant United States Attorney.  We have present

 8   Aaron Schock.  And we have George Terwilliger and

 9   Nicholas Lewis, Christian Egan and Jeffrey Lang on

10   Mr. Schock's behalf.

11        Apparently we also have present United States

12   Attorneys Bryan Freres, Victor Yanz, and Matthew

13   Weir.

14        I have a list of witnesses who are variously

15   represented.  Karen Haney by J. Steven Beckett.

16   Dayne LaHood by William Coffield.  Mark Roman, who

17   will be present by video, represented by Melvin

18   White, who will also be present by video.

19        Before we begin with substantive issues, is

20   there any objection to my courtroom extern and

21   clerks attending this hearing?

22            MR. BASS:  No, Your Honor.

23            MR. TERWILLIGER:  No, Your Honor.

24            THE COURT:  All right.  If you'll advise

25   them.
```

1          Now, who is here on behalf of the Amicus?

2     Anyone?

3               MR. BASS:  No, Your Honor.  As you may

4     recall from their motion, they were not asking to

5     appear or seeking oral argument.

6               MR. TERWILLIGER:  Just for the record, Your

7     Honor, I think the motion said they would be happy

8     to appear if Your Honor wished them to appear.

9               THE COURT:  All right.  That is what I

10    recollect.  I'd forgotten that.

11         I did give them leave to file the motion and I

12    reviewed their motion, as I reviewed everything else

13    frantically filed in this matter.

14         So, first of all, the issue of whether this

15    hearing should be open.  I think that would be up to

16    Mr. Schock whether he wishes it to be.

17              MR. TERWILLIGER:  Your Honor, we think that

18    the -- we've not objected to this being closed or

19    otherwise really taken a position, the Government

20    moved that the proceedings to date would be closed.

21         But at this point it seems to us that the law

22    is that absent the discussion of actual Grand Jury

23    material or the presentation of actual Grand Jury

24    material, where the issue is whether an individual

25    would be possibly incarcerated, that the law is

1    pretty clear that these proceedings should be open.

2           THE COURT:  Mr. Bass, do you have any

3    objection?

4           MR. BASS:  Your Honor, I think the law as

5    to Rule 5(e)(5) says, which we quoted in our brief,

6    that the matter should be closed to the extent that

7    it reveals matters occurring before the Grand Jury,

8    so -- and the three circuits court opinions that we

9    cited I believe all stand for the proposition that

10   at least Court's ruling on the motion for contempt

11   and any imposition of a remedy should be done in

12   open court.  And the Government's -- the Department

13   of Justice's policy is consistent with that.

14       So I have no -- the Government has no objection

15   to that part of the proceeding being unsealed.  What

16   I don't think would be appropriate, and is

17   consistent with what we've done and it is consistent

18   with what we've done so far, is, depending upon what

19   Your Honor allows; if we were gonna get into witness

20   testimony, for example, and discussion of exhibits;

21   then those are matters that have been presented to

22   the Grand Jury and are before the Grand Jury.

23       So unless we were to go back and forth at each

24   stage of the proceedings here and identify is this a

25   matter occurring before the Grand Jury or not, I

1   think the simplest alternative would be just to

2   ensure that what certainly should be public should

3   be Your Honor's ruling at the end of the proceeding

4   and the imposition of a remedy, if any.

5            MR. TERWILLIGER:  Well, Your Honor, it's

6   not about what the simplest alternative is, of

7   course, it's about a due process.

8        And they -- the cases as we read them; and I

9   think this is pretty clear; is that the presumption

10  is that a proceeding like this would be open unless

11  a portion needs to be closed for a reason.

12       We have the burden of going forward here.

13  We're not presenting any witnesses having to do with

14  the Grand Jury.  We don't know what happened in the

15  Grand Jury.  We're obviously not presenting any

16  exhibits that have anything to do with the Grand

17  Jury.

18       And as you know, of course, Judge, part of the

19  rationale for having a proceeding like this open is

20  to promote public confidence in the system of

21  justice.  I think it's common sense that public

22  confidence would be greater to see the proceedings,

23  not just the results.

24       So our position would be that Your Honor should

25  open the proceedings and open that record.  Unless,

1    if there's something that really would reveal a

2    matter occurring before the Grand Jury, then that

3    portion should be closed.

4              THE COURT:  Well, I'm going to make a

5    number of rulings before we begin that may

6    foreshorten the objection of Mr. Bass as well as the

7    proceeding itself.

8         There has been filed a motion by the Government

9    to authorize disclosure to Department of Justice

10   Technical Services.  There's been no objection as of

11   yet to that motion, but the time hasn't expired for

12   that.

13        Mr. Terwilliger, do you object to that motion,

14   or do you even know?

15             MR. TERWILLIGER:  I don't recall seeing

16   that motion, Your Honor.

17             THE COURT:  Really?  It was filed...

18             MR. BASS:  You're talking about an in re

19   Grand Jury motion, Your Honor?  Which would not be

20   part --

21             THE COURT:  Well, that might be why.

22             MR. BASS:  Yes.

23             THE COURT:  It was a request for a standing

24   order.

25             MR. BASS:  Yes, Your Honor.  But that's

1    not -- that has nothing to do with this proceeding.

2    It has to do with when the Government seeks to

3    transmit Grand Jury material to its database center

4    in South Carolina, we typically get an order

5    authorizing that disclosure from the Court and

6    that's what that motion is.

7            THE COURT:  Okay.  And -- but I was a

8    little curious; you're asking for a standing order?

9    Is that just in that proceeding?

10           MR. BASS:  Yes, Your Honor.  Yes.

11           THE COURT:  Okay.  That makes sense, all

12   right.

13           MR. BASS:  And, Your Honor, just so the

14   record is clear.  Since this hasn't been raised

15   before and the Government is the one who raised it;

16   I have -- the Government has no objection to this

17   matter being unsealed.  What we do object to is

18   unsealing those portions of the hearing where we are

19   discussing matters before the Grand Jury, which Rule

20   6 prohibits.

21       So I just want the record to be clear, we have

22   no objection to unsealing the proceeding to that

23   extent.

24           THE COURT:  I think that's what

25   Mr. Terwilliger is asking for, is it not?

1          MR. TERWILLIGER:  Yes, Your Honor.

2          THE COURT:  All right.  So at this time it

3     will be unsealed.  And you'll -- I'll put the burden

4     on you, if you think it's Grand Jury information

5     that should be sealed, to request to reseal it.  And

6     we will also allow the courtroom to be open unless

7     there's going to be something confidential with the

8     Grand Jury that needs to be discussed.  Okay?

9          All right.  I have to say I appreciate the

10    amicus brief and I have been persuaded that the

11    congressional office is not a collective entity,

12    it's more akin to a sole proprietorship.

13         I understand that there is no challenge as to

14    whether or not any of the campaign entities are

15    collective entities?

16          MR. TERWILLIGER:  Yes, Your Honor, but we

17    remain of the position that we've stated before that

18    Mr. Schock is not a custodian of those records.  And

19    to the extent that he would possess any records from

20    the campaign, he would possess those in his personal

21    capacity and privilege would still apply.  And as of

22    now, he would be obligated -- or as of a couple

23    weeks ago, he would be obligated to produce those,

24    which he would produce those, because we have an

25    immunity agreement by letter with the Government.

1          THE COURT:  Okay.  So then those four

2   entities still have not produced anything?

3          MR. TERWILLIGER:  No, that's -- that's not

4   correct, Your Honor.

5      The state of affairs on that, as best I

6   understand it; recall that they are separately

7   represented right now by Mr. Bopp; is that -- and

8   you know, perhaps Mr. Bass can speak to this more

9   knowledgeably than I can.  Those entities have

10   produced records to Mr. Bopp.  That the Government,

11   in fact, obtained a lot of those records; I can't

12   say all of them because I don't know what they have;

13   by virtue of the search warrant that Your Honor

14   issued.

15      And that at the conclusion of that; again,

16   Mr. Bass can speak for himself; he relieved the

17   campaign on the strength of the material obtained

18   pursuant to the search warrant of the obligation to

19   produce anything further.

20      In other words, the Government had everything

21   it was looking for.  Or so I understand.

22          THE COURT:  From those four entities?

23          MR. TERWILLIGER:  Yes.

24          THE COURT:  Is that right, Mr. Bass?

25          MR. BASS:  Your Honor, one of the purposes

1    of this proceeding today is to show that Mr. Schock

2    is in contempt of your order to produce campaign

3    records.  That he's not complied with your order, is

4    the short answer.

5         And unless you wish to put Mr. Terwilliger and

6    I under oath and we testify, then I believe we at

7    least need to proceed.  But I would like to address

8    Your Honor's initial ruling at some point.

9         The state of the proceedings as to the campaign

10   records are, as you are aware, Your Honor enforced

11   subpoenas and directed Mr. Schock, and no one else,

12   to comply with the obligation to produce campaign

13   records from all the campaign entities.  He didn't

14   do that.

15        And in the meantime Your Honor issued a search

16   warrant for those campaign entities' offices in

17   Peoria.  And we have said that we are not seeking to

18   have Mr. Schock duplicate that which he did not do

19   and the search warrant did.

20        But we believe that there are other campaign

21   records out there, in his possession, which he has

22   directed his campaign manager, for example, to

23   provide him personal copies of, which he himself has

24   obtained copies of months ago.  And we have letters

25   from Mr. Schock's counsel post-July 6th indicating

1   that they're now going to be producing personal

2   records, which presumably have some campaign records

3   in them, on a rolling basis.

4        And with respect to the subpoena; the separate

5   subpoena which was issued in addition to and not as

6   a substitute for Your Honor's order; Professional

7   Data Services, which is the entity that is -- houses

8   the treasurer of these campaign entities, still has

9   not complied with -- Mr. Schock, through Your

10  Honor's order, has not complied with having

11  Professional Data Services provide all those

12  campaign records.  Nor has Professional Data

13  Services itself complied with a separate subpoena

14  issued to it.

15       So the short answer is that there has not been

16  compliance, there was not compliance by July 6th, of

17  Your Honor's two orders with respect to campaign

18  records.

19       Your Honor, if I may, at the appropriate time,

20  if I could address your initial statement about the

21  collective entity at some point.

22           THE COURT:  All right.  So, Mr. Bass, when

23  you say campaign records that have not been

24  produced, are you referring to the entity Schock for

25  Congress?

1          MR. BASS:  Schock Victory Fund, GOP
2     Generation Y.  And the 18th -- well, the --
3          THE COURT:  Did you say Schock Victory
4     Fund?
5          MR. BASS:  Yes.
6          THE COURT:  Okay.  So they're the four.
7     All right.
8          MR. BASS:  Let me -- just so I'm clear,
9     Your Honor, I want to go back at the language of the
10    subpoena.
11        Schock for Congress, Schock Majority Fund, GOP
12    Generation Y, and Schock Victory Committee; that's
13    Paragraph 1 of the subpoena to Mr. Schock.
14         THE COURT:  Okay.
15         MR. TERWILLIGER:  So, Your Honor, just so
16    we're clear, and I don't -- if I've misconstrued
17    something Mr. Bass said, I apologize and I'm sure
18    he'll correct me and we can get this straightened
19    out.
20        In terms of what we're here for today in
21    relation to the campaign records.  The issue for
22    Your Honor would be does the Government -- is the
23    Government entitled to some imposition of a coercive
24    sanction in order to get Mr. Schock to do what he
25    hasn't done to date.

1      It's not -- it's prospective.  It's not a

2  question of did he do something by July 6th or not.

3  He obviously didn't produce those records by

4  July 6th.  But this isn't punitive, this is

5  coercive, it's prospective.

6      But that being said, there's no issue here,

7  because the Government has the records from the

8  campaign, by its own admission, that are responsive

9  to the subpoenas that were issued to the campaign.

10     Mr. Schock complied with his obligation.  Our

11  position is very clear, he complied with his

12  obligation as to the records of those organizations

13  by hiring counsel and directing that counsel and the

14  treasurer; who is the lawful custodian of those

15  records, and the sole lawful custodian of those

16  records under relevant FEC law; to produce those

17  documents.

18     And just leaving aside for a second the search

19  warrant and all of that, the records from PDS, the

20  service that Mr. Kilgore works for, I understand

21  from Mr. Bopp; and that's the only way that I know

22  this; that the Government has issued a subpoena to

23  that entity as a business for any records that it

24  has related to Mr. Schock.

25     Obviously Mr. Schock is not a custodian of the

1    records that are in the hands of that business.  So

2    the only thing that leaves that I think -- I'm

3    sorry, did Your Honor have a question about that?

4             THE COURT:  Well, I have a note here that

5    Schock for Congress, Kilgore's not the custodian.

6    And Schock Victory Fund, he's not the custodian.

7             MR. TERWILLIGER:  He's the treasurer of

8    each one of those.

9             THE COURT:  He is.

10            MR. TERWILLIGER:  Yes.  And he's here today

11   and can testify to that if Your Honor wishes.

12            THE COURT:  Okay.

13            MR. TERWILLIGER:  But if what Mr. Bass is

14   referring to as records that Mr. Schock had for

15   months related to the campaign, then I assume he's

16   referring to records that Jones Day, his counsel,

17   collected from the campaign offices before the Grand

18   Jury subpoenas in this case were issued, which we

19   maintain he has no obligation to produce those

20   because they're -- the compilation of those is

21   attorney work product.

22        And even if he did, work product

23   notwithstanding, obviously they're in his possession

24   and the possession of his agent as a personal

25   matter, not as a custodial matter for a collective

1    entity so that he can attend to his legal affairs,

2    and thus he would -- he would have a personal

3    privilege, a Fifth Amendment privilege, as to the

4    production of those; whether it's a collective

5    entity or not.

6        So in other words, he's not -- to the extent

7    that Jones Day, on behalf of Mr. Schock, as his

8    agent, collected records; leaving the protected

9    status of those aside for a moment; he holds them in

10   a personal capacity in order to work with his

11   attorneys on what were then unrelated legal issues

12   and not in a representational capacity for the

13   campaign.

14       And I analogize this I think simply to this,

15   Your Honor, we all have bank accounts.  If we go to

16   the bank and say give us copies of the records of

17   our account such and such, and they give them to us,

18   we don't become custodians for the bank records.  We

19   are, in fact, in personal possession of those

20   records.  The bank remains the legal custodian of

21   those records.

22       And I can't cite you the chapter and verse, but

23   under banking laws, like under FEC law for the

24   campaign organizations, they have an obligation to

25   hold those records and they would be the custodians

1    of them.

2         So with that understood, I don't -- there just

3    isn't an issue with the campaign records.

4         Finally, even if there is, and even if Your

5    Honor has a question about whether Mr. Schock has a

6    privilege or not as to any campaign records he

7    holds, for example, through the Jones Day

8    collection, I would say two things.

9         One, the -- the cases which are cited in our

10   brief at some length make clear that courts should

11   avoid the constitutional issue in a situation like

12   this, and in fact, look to an alternative custodian

13   who can produce the documents.

14        And here the Government has done that.  And

15   presumably they should be satisfied and Your Honor

16   should be satisfied that they got what they were

17   looking for through the production that is either

18   made or being made by those campaign organizations

19   themselves and their treasurer, the lawful

20   custodian.

21        One of the features of this entire dispute,

22   which I think is very unfortunate, is that

23   everything the Government has been trying to do has

24   been to try to force Mr. Schock to take possession

25   of records he doesn't possess and then produce them.

1          I don't want to re-argue that dispute, Your

2     Honor, but there's no reason to do that with the

3     campaign records now because the Government has what

4     it's looking for.

5          And we freely acknowledge that if Mr. Schock

6     does have campaign records that he holds personally,

7     he would have -- and that the Government doesn't

8     already have, or even if -- I mean Mr. Bass has told

9     us before he's not looking for Mr. Schock to

10    duplicate the production of anything he already has.

11    I don't know exactly how we would know what they

12    have and what they don't have.

13         But if Mr. Schock has any records from the

14    campaign organizations that he holds in a personal

15    capacity, we have, more than once, acknowledged the

16    obligation to produce those.

17              THE COURT:  So have you, in fact, produced

18    anything pursuant to this immunity agreement?

19              MR. TERWILLIGER:  Yes.  Thousands of pages

20    of documents.  And we continue to do so.

21              THE COURT:  Has Jones Day produced any of

22    the campaign entity records?

23              MR. TERWILLIGER:  No.  And we've not -- let

24    me put it this way, we've not produced any of the

25    documents from the Jones Day collection because our

1    position on those is that the collection itself

2    constitutes work product.

3              THE COURT:  And then if the Government were

4    to seek the Congressional records from the House

5    directly, and that would be the copies they kept --

6    well, first of all, has there been any attempt to do

7    that?

8              MR. BASS:  You want me to address that

9    issue on the House, Your Honor?

10             THE COURT:  Hm-mm.

11             MR. BASS:  Your Honor, first, your ruling

12   takes -- as I hope you understand, takes the

13   Government by surprise, since there was no motion to

14   reconsider that issue.  And we very aggressively

15   argued why it is prohibited from reconsideration in

16   this proceeding.  But given that Your Honor has

17   indicated that's what she intends to find, I would

18   first ask if Your Honor would, now that you've

19   allowed an amicus memorandum in support of a ruling

20   Your Honor previously decided and declined to

21   reconsider, if before Your Honor made final ruling

22   on that, if you would allow the Government and

23   Mr. Schock further opportunity to brief this issue.

24        This has been the Department of Justice's

25   position for years, Your Honor.  And it was the

1    Department of Justice's position in the Doe case in

2    the 4t Circuit several years ago and was argued by

3    the Chief of the Appellate Section of the Department

4    of Justice.  It has been the Department of Justice's

5    position for years.  And we've reaffirmed that up

6    until this very date.

7        Mr. Terwilliger has sought to -- sought the

8    intervention of officials within higher levels of

9    the department, who chose not to intervene.  And we

10   have again confirmed that the position that the

11   Department of Justice took in this case with respect

12   to collective entity is the position of the

13   Department of Justice and was the position of the

14   Department of Justice for years.

15       And so we would like an opportunity, Your

16   Honor, to further brief you in response to the amici

17   brief that was filed, if Your Honor would permit

18   that.

19            THE COURT:  I will.

20            MR. BASS:  But as to your second question,

21   what -- have we issued a subpoena to the House of

22   Representatives.

23       And, Your Honor, if you recall, you asked that

24   question in our -- in our order to show cause

25   hearing.  And I believe I answered that in detail,

1    but let me, if I may, answer it again even in more

2    detail.

3        Here's what's gonna happen if Your Honor makes

4    that ruling.  The Government's only other means,

5    because the DC Circuit has held that a search

6    warrant -- the Government's execution of a search

7    warrant is a violation of the speech and debate

8    privilege.  The DC Circuit has held that, the 9th

9    Circuit has rejected that ruling.

10       But in short, there will be no search warrant

11   of Mr. Schock's former offices, either in DC or in

12   Illinois.  That leaves a subpoena to the House

13   clerk, as a result of Mr. Schock's choice to walk

14   away from the office after he was served.

15       Through my discussions with Mr. Kircher, here's

16   what's gonna happen.  All that we are going to do is

17   we're gonna replace Kerry Kircher for Aaron Schock.

18   And we're gonna be right back in front of you for

19   weeks further litigating the initial validity of the

20   subpoena that would be served on the House, the

21   breadth of the subpoena that's served on the House,

22   the time frame for compliance by the House.

23       And then at the end of the day what's gonna

24   happen is the House of Representatives is gonna take

25   all the records that they have deemed responsive to

the identical subpoena that would be issued to them
and they're gonna give them to Mr. Terwilliger and
Mr. Schock and give them an opportunity to assert
the same Fifth Amendment privilege that Congressman
Jefferson did in the 4th Circuit.

Now, the 4th circuit rejected that, because
they said that Mr. Jefferson did not have the right
to assert a Fifth Amendment privilege as to records
that were in his chief of staff's possession.  But
the Congressman asserted that privilege and the
House of Representatives supported him.

The second thing that's gonna happen is that
Mr. Kircher is gonna give these records to
Mr. Terwilliger and Mr. Schock to invoke the speech
or debate privilege, which they've already invoked
in a footnote.  And we're gonna be right back here.

In other words, all that -- we could issue a
subpoena and we have not issued a subpoena because
all that would do, Your Honor, would put us right
back to square one where we were four months ago and
we would be re-litigating all the issues that we
have litigated so far anew.  And the Grand Jury
would be continuing to wait session after session.

So that's why we didn't issue the subpoena to
the House of Representatives.  And I take Your

Honor's statement and your -- and your order to show

cause that given the paucity of the case law, the

Court was surprised why the Government took this

position.

And the Government understands that, Your

Honor, but again, we have taken that position for

years.  We've reaffirmed that position up to the

present date.  And the reason why we didn't do it is

because all we're gonna do is go right back to

square one and litigate these same issues all anew

with the House instead of with Mr. Schock, which

Mr. Schock will then join in before there is full

compliance.

So that's why we haven't done it.  If Your

Honor sustains her -- enters a final ruling as you

indicated today, reversing her position, then our

only choice will be to issue a subpoena to the House

of Representatives and to start -- either appeal

that ruling or to start anew.

Now, with respect to the campaign records, Your

Honor, we have, as I've said -- I think I used the

word more -- measured more than once in these

proceedings the last few month.  Measured.

And we have sought, by way of a subpoena,

compliance with these records.  We've sought only

the records.  We've offered direct use immunity for the production of all the records; campaign, House, personal records.  It was initially accepted, then rejected, then when the Government said we would have to pursue other lawful means for production of personal records, only then did Mr. Lang and Ms. Egan come to the Government and say that now Mr. Schock was willing to sign that direct use immunity agreement, but only for personal records.

Again, Your Honor, in the absence of compliance with these subpoenas and Your Honor's orders, our recourse is to pursue other lawful means, either as to Mr. Schock or as to his counsel Jones Day.

We are trying, in the most measured way we can, to get compliance with Your Honor's orders.  And Your Honor ordered on June the 18th -- the Court held that the "Schock subpoena which the Court enforced on April 9th, 2015, required, without qualification, that Mr. Schock produce campaign entity records that he held in his representative capacity."

Your Honor ordered him; Mr. Schock and no one else; to produce all campaign records, all responsive campaign records.  And we are prepared today to present to you evidence that he's not done

1    that by July 6th.  And he still hasn't done it.

2         Now, he has, after July 6th, begun to produce

3    some personal records; several thousand pages, as

4    Mr. Terwilliger said.  But they're not indexed.  We

5    don't -- we've just begun to -- there's a 1400 page

6    submission initially and then just last week we got

7    a several thousand page submission, but there's no

8    index of them.  We don't -- there are some campaign

9    records in there, but there's not complete

10   compliance with Your Honor's order.

11        And Mr. Schock even says in his transmittal

12   letter that he's decided that he's gonna produce

13   these on a rolling basis.  He's decided he's gonna

14   produce the records on a rolling basis that Your

15   Honor ordered him to respond to and provide by

16   July 6th.

17        So again, on a measured basis, unless we obtain

18   the remedy today that Your Honor ordered, which is

19   for Mr. Schock to show cause, the only purpose of

20   today's hearing is for him to show cause.  Assuming

21   that he doesn't dispute that there was a valid order

22   and that he's not complied with the order.  And

23   we're prepared to present evidence as to those two

24   elements.  But assuming that there's no dispute as

25   to those two elements, then the only issue today is

1    for him to show just cause.

2        And if he can't show just cause, then the

3    statute is clear as to what the remedies are that

4    Your Honor can impose in her discretion to coerce

5    that compliance.

6        And we have, I believe, further in a measured

7    way requested a measured remedy; a fine initially

8    and seven more days to comply before the Government

9    asks you to confine him.

10       Thank you, Judge.

11           MR. TERWILLIGER:  Your Honor, I'll try to

12   be as brief and go to the points as I can.

13       So let me go back, if I might first to the

14   House records and the remarks that were occasioned

15   by your question about subpoenaing them from the

16   House.

17       You know, I don't know -- unlike Mr. Bass

18   apparently, I'm not clairvoyant enough to know what

19   the House would do if it got a subpoena.  And I'm in

20   no position to argue one way or the other what they

21   would do.

22       With that --

23           THE COURT:  Let me ask, Mr. Bass, have you

24   talked to Mr. Kircher and asked him what he will do?

25           MR. BASS:  Yes, Your Honor.  And he told us

1    what he would do when Mr. Terwilliger and I were in

2    his office discussing this very thing.  He told

3    Mr. Terwilliger exactly what he would do.

4         MR. TERWILLIGER:  That -- Your Honor, that

5    was back -- that was a long time ago.  That was back

6    in either late April or early May, when we were

7    trying to work this out and we had authorized

8    Mr. Kircher to go ahead and produce records from his

9    custody, from the clerk's custody, pursuant to the

10   subpoena to Mr. Schock.  And Mr. Kircher said, "I'm

11   not going to produce those records for him."

12        And Mr. Bass brought up the possibility of

13   giving them a subpoena and Mr. Kircher remarked, in

14   this informal discussion, that he might file a

15   motion to squash or modify that subpoena to make it

16   more limited.

17        Whether he would do that today or not, I

18   certainly wouldn't purport to speak for him or to

19   take that as evidence of what he, under the

20   instructions of the -- I think it's called the

21   bilateral group, whatever it is, would do.

22        But I can tell you what we do, Your Honor.  Go

23   to that part of what -- of what Mr. Bass said.  And

24   I -- I believe the transcript will show that we have

25   made this representation to the Court before.

1        We recognize that Mr. Schock has no Fifth

2   Amendment right to make a privilege claim as to, and

3   I'll speak specifically, to the congressional

4   records that are being produced through someone

5   else.  That was one of the issues in the Jefferson

6   case.  We've never said that we would object to

7   that.  And in fact, as I just said, we authorized

8   the House to produce those records.

9        So the doomsday scenario of us reasserting a

10   Fifth Amendment privilege through Mr. Kircher's

11   production should the House have a subpoena would

12   not -- would not occur.

13        Secondly, as to -- as to speech or debate

14   clause considerations.  There are two relevant

15   points I think for Your Honor to consider there.

16        One is that that privilege belongs to both

17   Mr. Schock and to the House.  And the House has

18   asserted that privilege on behalf of members.

19        We, of course, would be happy to work with

20   Mr. Kircher to identify speech or debate material

21   that might be among those records that are

22   responsive.  And if the Government disagreed with

23   that on a privilege log or something, we would

24   resolve that in the normal fashion that privilege

25   issues are addressed.  I don't see that as any

1    doomsday scenario there either.

2        So I don't -- I don't see that Your Honor's

3    question is -- is frankly all that problematic for

4    the Government.

5        As to the campaign records, I think something

6    Mr. Bass just said sort of points to the issue.  We

7    have simply maintained that as to the Jones Day

8    collection, as to any other campaign records that

9    might be in Mr. Schock's personal possession; copies

10   of them, not originals.  Recall that Your Honor

11   asked, or directed, Jones Day to certify to the

12   Court and to the U.S. Attorney's Office that all

13   originals from the copying they did were returned

14   both to the campaign offices and to the district

15   offices.  And they've done that and they've made

16   that certification.

17       The point about the records that are held --

18   any campaign records that are in Mr. Schock's

19   possession is that he doesn't hold them in a

20   representative capacity, just for the same reason I

21   spoke to concerning the bank analogy.

22       But more importantly, the Government has those

23   records.  Why on earth would Mr. Schock need to

24   duplicate the production of those records or do

25   anything else when they already have them?

It certainly doesn't serve any purpose
prospectively to impose some kind of a sanction on
him under 1826 to produce records that the
Government already has in the face of a privilege
claim that is at least, on its prima facie basis, is
valid.

So, Your Honor, we are prepared today to
present testimony on these issues about the
completeness of the production of the campaign
records, on the entity issue.  We have a man here --
and I do want to go back to something about that.

Mr. Bass has said repeatedly to Your Honor that
Mr. Schock left those records behind in his office,
as if he was -- I don't know what the point of that
is.  Maybe he was abandoning them or something.

There's a gentleman here today who runs the
Dirksen Center, which has received the records of
every member that represents what is now the 18th
District in Illinois since Everett Dirksen held the
seat.

And he is prepared to recount, and I would
offer Your Honor as a proffer that he has often
received those records directly from the House
through a deed of gift from the member.  Thus
showing that Mr. Schock's leaving the records behind

1    is not any devious or unusual or tactical choice,

2    it's just what you do.  You don't pick the records

3    up and move them out.

4         And secondly, in this electronic age, he

5    couldn't do that.  Because the fact of the matter is

6    that many of the computers upon which the electronic

7    parts of those records reside, the electrons or on a

8    hard drive, those belong to the House of

9    Representatives.  So while the records themselves

10   may belong to Mr. Schock, the source of those

11   records; the filing cabinet, if you will; belongs to

12   the House.

13        And as a practical matter, the only way to get

14   copies of those is to image those hard drives and

15   get an image, which requires the cooperation of the

16   House and is a rather extensive process.

17        So I think, Your Honor, where we end up here,

18   assuming -- and I -- you know, I -- in terms of

19   further briefing on the collective entity issue; I

20   understand that the Justice Department has taken a

21   position.  I don't know what their position is, I'm

22   not familiar with it.  It's not something that even

23   in my experience I ever dealt with, at least that I

24   recall.  But I think the House has given you a

25   definitive sort of third-party view there.

1        And the -- to me, the defining issue on that;

2    which I don't see how the Justice Department can --

3    can refute; is that in order to hold the documents

4    in a representational capacity, there has to be some

5    collective entity identified.  And I think what

6    Mr. Kircher's affidavit shows -- or his amicus

7    filing shows very clearly is that you can't get to

8    that part of it.  There is no collective entity.

9    The office and the man are inseparable under the

10   House rules and practice.

11       So I mean if the Government wants further

12   briefing on this, I suppose we could have further

13   briefing, but I don't think it's gonna change a

14   thing at this point.

15       Thank you, Your Honor.

16           MR. BASS:  Your Honor, may I make a few

17   more comments --

18           THE COURT:  Hm-mm.

19           MR. BASS:  -- since essentially both of us

20   are testifying now.

21       What we have said -- and we have -- and we have

22   not lightly said it, about these continually

23   changing positions; saying one thing to Your Honor

24   and then saying another and then standing before

25   Your Honor now and just saying, he's not a

collective entity, when Your Honor has already held

that he's a representative of his campaign entities.

Your Honor has already specifically held that.

I can't imagine treating Your Honor's orders,

as often as I appear in front of you, in the way

that Aaron Schock has treated your orders.

Are we gonna just go right back to the

beginning and pretend that we haven't litigated all

this, all of this, for the last fourth months?  And

now just say, just because George Terwilliger says

so, that he doesn't represent -- he doesn't hold any

campaign records in a representative capacity.

We're prepared to present evidence to you that

he does just that.  He controls the whole thing.

He's spending one third of the campaign's assets.

Mr. Kilgore, who is the treasurer, has never even

met Mr. Schock.  He's never had a piece of original

campaign records in his possession.  The only thing

that he gets are copies e-mailed to him from Peoria

from the campaign office that Aaron Schock controls.

He's taken checks and wrote checks, he's sold

assets, he's spent campaign money.  And yet Your

Honor has ruled that he's a representative of those

campaign entities, Your Honor has ordered him as a

representative to comply, and he still sits here

1    today and says -- pretends as if that didn't happen.

2    And wants to go back to litigate those issues.

3        About respect to the speech or debate, I take

4    Mr. Terwilliger at his word.  That if we were to

5    issue a subpoena to the House of Representatives,

6    that Mr. Schock would not assert a Fifth Amendment

7    privilege.  And I would ask, Your Honor, if you

8    would, to remove any question, ask Mr. Terwilliger

9    to confirm that there will be no assertion of any

10   Fifth Amendment privilege if Your Honor sustains her

11   reversal of her ruling and we do issue a subpoena.

12       That leaves the speech or debate privilege.

13   Now, remember where we are with that.  When the

14   Government first issued these subpoenas on

15   March 18th and March 19th, and then the last one to

16   Mr. Schock on March 31th, he filed a motion to

17   squash, ignoring the first two congressional

18   subpoenas and only attacking the one to him.  He

19   asserted no privilege.  We had a hearing before Your

20   Honor on April 9th and he asserted no privilege.

21   Your Honor ordered him to comply.

22       And only two months later, in June, when he

23   filed his motion to modify, and Your Honor held that

24   he could do that because that preceded the

25   Government's motion for an order to show cause, and

1    Your Honor declined to reconsider, only in his

2    motion for clarification did he assert a Fifth

3    Amendment privilege.  He didn't assert a speech or

4    debate privilege.  Again he didn't.

5        And with all of this wealth of experience, and

6    particularly legal experience, for two months he

7    doesn't assert a speech or debate privilege.  And

8    only in his reply to the Government's motion for an

9    order to show cause, in a footnote, in a one

10   sentence footnote, does he assert a speech or

11   debate.

12       He hasn't lifted one finger to go through those

13   records and identify a privilege log or what's

14   speech or debate.  And many of them, most of them,

15   are not.  We're not -- we haven't subpoenaed speech

16   and debate privilege material, we subpoenaed

17   financial records.  But Mr. Schock and his counsel

18   haven't lifted one finger.

19       And Mr. Terwilliger tells you, Your Honor,

20   today, that the Government can go get those records,

21   subpoena.  Here's what the told the Department of

22   Justice leadership just a few days ago:

23       "The Judge yesterday denied our request,

24   opposed by the Government, to reconsider allowing

25   the House to see the sealed pleadings for purpose of

1    its possible involvement in the July 28th contempt

2    hearing.  I believe the House counsel is considering

3    moving the Court directly to see the pleadings.

4        "We remain amenable to trying to resolve this

5    dispute by agreement where we would take the House

6    records as owner and produce pursuant to a limited

7    immunity letter already agreed to for the personal

8    records if the Government would drop its demand to

9    received all the 18th District electronic

10   information in its entirety; that is, without speech

11   or debate review."

12       That's what he told the representatives of the

13   office of -- that he previously held, Deputy

14   Attorney General.  He's telling Your Honor something

15   different today.

16       We have, from the beginning, been willing to

17   resolve this issue of the production of the House

18   records pursuant to a direct use immunity letter.

19   We've offered it from day one.  It was initially

20   accepted, it was rejected, then it was accepted only

21   with respect to personal records.

22       Mr. Terwilliger tells you today that we should

23   start anew and issue a subpoena to the House of

24   Representatives.  He's told the Office of the Deputy

25   Attorney General that he would agree to produce the

1    records -- Mr. Schock would produce the records as

2    owner pursuant to a direct use immunity letter that

3    we offered months ago.

4         How do we deal with this?  How do we deal with

5    this?

6         And with respect to speech or debate, they

7    received, without lifting a finger or asking for

8    months, when we met with Mr. Kircher in April, at

9    the Government's initiative, we flew out there to

10   discuss this -- this very issue.  And in the months

11   that followed, they didn't lift a finger, Mr. Schock

12   didn't lift a finger to do any speech or debate

13   review, even though he had copies of the records

14   previously made months earlier.  And we haven't

15   asked to know what his lawyers -- what was in his

16   lawyers' minds when they chose to copy those

17   records, we want the records.

18        So he's had his own copy of the records to do a

19   speech or debate review, he's had access to the

20   records in the House to do a speech or debate

21   review.  He never asked for access, he never

22   asserted any access.

23        Only when Mr. Kircher, on his own initiative,

24   in the letters that have been filed of record, only

25   then, after Mr. Kircher on his own initiative said,

1   okay, we're gonna do our own review, because we

2   gotta get this office cleaned up because

3   Mr. Schock's successor is gonna take over this

4   office in September, we've gotta clean this place

5   out.  So we have gone through and we have determined

6   what records are responsive to the Government's

7   subpoena.  And we have removed the rest of those,

8   with the Government's agreement that those can be

9   disposed of.  And we've separated out the paper

10  records that remain.  And we will provide them to --

11  on our own initiative, not because Mr. Schock asked,

12  but on our own initiative, we will provide those

13  copies to you, Mr. Schock.  And they did so the

14  first of this month; the paper records.

15      They've not lifted one finger to do any speech

16  or debate privilege review.  Not one.  Not one page

17  of congressional records, not one assertion of a

18  page of speech or debate.

19      How do we deal with that, Your Honor?  If not

20  concluding that, as we've said from day one,

21  deceptive defiance of Your Honor's order.

22  Pretending as if it doesn't exist.

23      So all I'm saying to Your Honor is I think,

24  given the gravity of your ruling, we ought to be

25  able to brief it.

1        And two, if Your Honor sustains that reversal,

2   then given what I've just said to you before, we're

3   just gonna start back anew again.  Because we cannot

4   rely on the representations that are made to us.  We

5   just can't.

6            MR. TERWILLIGER:  Your Honor, I'm not gonna

7   try to address the impugning character and I'm not

8   going to return it in kind.  I'm just simply going

9   to tell Your Honor a couple of facts which Your

10  Honor can easily verify.

11       We filed an emergency motion to quash a

12  subpoena in this court on April 6th, 2015, which

13  Your Honor is familiar with.  Page 11 of that motion

14  raises speech or debate clause as an issue that

15  needs to be dealt with in terms of the timing and

16  the ability.  So we've raised speech or debate from

17  the very beginning.

18       We've raised active production from that very

19  same date and that very same occasion.  So

20  representations that are attempting to impugn

21  apparently my character about what we have or

22  haven't done seem to me to be out of order.

23       In terms of the letter that Mr. Bass read from,

24  what he read from the letter is exactly accurate.

25  What he does is misses the point.

1        The point isn't what was the hang-up in trying

2   to get an agreement as to the production of the

3   House records through us once they were given to us;

4   which they've come piecemeal, we still don't have

5   them all from Mr. Kircher.  We only took them as the

6   owner, not as the -- in a representative capacity.

7        The -- I forget what the favorite catch phrase

8   is of something defiance or whatever it is, is

9   simply maintaining a legal position on a

10  constitutional privilege.  That's not defiance, Your

11  Honor.  We would be entitled to maintain that

12  position through every ruling that Your Honor made

13  and on up to the Court of Appeals if we chose to

14  appeal.  So I hope Your Honor will disregard that

15  sort of thing.

16       Finally, on the -- on the campaign records and

17  this idea that it would be proof of Mr. Schock's

18  control of those records to show that he controls

19  other aspects of the -- of the campaign operations.

20       It occurs to me, and I hope I'm not going

21  someplace where I shouldn't, because I don't know

22  enough to, but let's take Your Honor's chambers as

23  an example.

24       Your Honor has a certain amount of authority

25  from the administration -- Administrative Office of

1    the Courts to hire personnel, to spend money on

2    various things, to direct the use of, I don't know

3    whether it's an account or allowance, but you have

4    some financial control over the operation of your

5    own chambers and your court.

6              THE COURT:  One would think so.

7              MR. TERWILLIGER:  Pardon me?

8              THE COURT:  One might want to think so.  In

9    reality it may not be true.

10             MR. TERWILLIGER:  Well, may I use it as a

11   hypothetical then --

12             THE COURT:  It would have to be a

13   hypothetical.

14             MR. TERWILLIGER:  -- for purposes of

15   illustration.

16        But assuming that to be the case in one degree

17   or another, Your Honor, that does not make you a

18   custodian of the records of this court.  When you

19   leave the court, if you were to leave the court, the

20   court's gonna maintain custody of those records and

21   be the custodian of them.

22        If there was a subpoena from somebody to this

23   court to produce them, you wouldn't produce them as

24   the custodian, they would be produced by the clerk,

25   who is the custodian.

1      However rough that analogy may be, the same

2   thing is true with the campaigns.  Mr. Schock may

3   have an authoritative position with those campaigns

4   and being able to direct certain activities.  And

5   we, in good faith, had him direct the very activity

6   that's at issue here to fulfill the subpoena.

7   Here's a lawyer, here's the treasurer, you two get

8   together, produce the records.  I don't see how

9   that's in the least way contumacious.

10      And now that they have all the records, Your

11   Honor, I don't even know why we're talking about,

12   you know, what he could have or should have done by

13   July 6th.  They have the records.  There's no reason

14   to further consider that issue.

15          THE COURT:  Are there affidavits filed by

16   people who were custodians that actually assert that

17   all the records have been produced?

18          MR. TERWILLIGER:  I don't think -- I don't

19   know if there are affidavits filed, but -- and

20   again, you know, maybe the practice is different in

21   this district or with Mr. Bass.  But the typical way

22   that a prosecutor would do that with a custodian is

23   to put the custodian in the Grand Jury and say, have

24   you produced all the records?

25      The custodian, as we all know now so well,

doesn't have Fifth Amendment privilege in terms of

even if there was an issue with that.

So that's the way it's typically done. Perhaps

Mr. Bass accepts either representations or

affidavits to that the -- to that effect.

And I think we -- we were prepared to put on

testimony today, or at least elicit testimony from

somebody from the campaign, that as far as she

knows, the Government got all the records through

the search warrant. The records that she would be

aware of.

THE COURT: Well, the last question I was

going to ask earlier and had abandoned was has

Mr. Schock done anything to address the speech and

debate --

MR. TERWILLIGER: Thank you, Your Honor. I

appreciate that.

So I'm not going to -- I don't want to be

forced into the position of talking about what work

product we've performed since receiving these

records from the House. But -- but I hope Your

Honor would accept the representations that I and my

colleagues are not damn fools. And since those

records have been -- come in, even though our

position remains that he has no obligation to

1    produce them unless and until he gets proper

2    immunity, that we are doing what we should be doing

3    under the -- under the circumstances; which in our

4    judgement would include looking at speech and debate

5    issues.

6         One more thing on the speech and debate, Your

7    Honor.  I digressed before.

8         The point about the letter that Mr. Schock -- I

9    mean Mr. Bass read where I asked the Justice

10   Department to help us try to resolve this issue

11   short of further litigation.  The point of

12   contention was that the Government was demanding, as

13   part of an agreement with us, that they would get

14   and hold all of the electronically stored

15   information from the 18th District offices.

16        And we have to object to that on the basis of

17   speech and debate.  Because at least under the DC

18   Circuit's well-reasoned decision concerning speech

19   or debate, speech or debate has -- the privilege

20   itself has a non-disclosure element.  So the

21   Government's not even suppose to have that stuff and

22   look at it, let alone be going through it.

23        So our objection was we don't want you to have

24   all of the electronically stored information.

25   Whether you say you're gonna put it in a lock box or

1    not is irrelevant.  Under speech and debate, you're

2    not suppose to have it.

3        And -- which is, frankly, Your Honor, and I

4    totally understand why you would have thought this;

5    there was one point in these proceedings where we

6    either had some discussion about this, I believe in

7    the context of whether it would require the Court to

8    get involved in a document by document review.

9        If -- if I can try this just conceptually.  The

10   way speech or debate -- addressing the speech or

11   debate privilege should work is, first of all, it's

12   only relevant to documents that are responsive to

13   the subpoena.  We don't want to review millions and

14   millions of documents over a five year period for

15   the academic exercise of determining whether there's

16   speech or debate material there.  We only want to

17   look at those that are responsive.

18       So the first step is what's responsive to the

19   subpoena.  And then the second step is, in that

20   which is responsive, what of it may be validly

21   claimed as speech or debate material?  That would go

22   onto a privilege log, presumably, which would be

23   made available to the Government.  And if the

24   Government then had issue with the description of

25   the document and its speech or debate

1    characteristics, then we might have to get into some

2    kind of in camera dispute resolution issue.  Which I

3    know Your Honor is just dying to engage in.

4        But I think -- most of these things I think

5    would be worked out, because speech and debate is --

6    while broad, I mean it's fairly clear that a lot of

7    things probably would not be speech or debate.

8    Financial records, as Mr. Bass suggests, for

9    example.

10        So the hang-up, just so it's clear, Judge, the

11   hang-up with the trying to make an agreement with

12   the Government to -- to avoid further litigation,

13   the hang-up wasn't about what kind of immunity we

14   wanted, the hang-up was about whether or not the

15   Government would have in its possession all of the

16   electronically stored information of the House

17   records.  Which is the bulk of it.  Most of the --

18   the volume of paper records which are responsive,

19   bigger than we thought, but is not huge.

20           THE COURT:  So the bottom line is did the

21   Government agree with you?

22           MR. TERWILLIGER:  No.  No.  We did not

23   reach -- we did not reach agreement on that and the

24   Justice Department declined to try to help us reach

25   agreement on that.  And so that's why we're here.

1           MR. BASS:  And, Your Honor, the reason why
2      we're here is because, as I just heard; and Your
3      Honor can correct me, I'm not trying to impose
4      unnecessary adversity in these proceeding; but as I
5      just heard Mr. Terwilliger say, in effect, Your
6      Honor's order, unequivocal order to do something by
7      a specific deadline, is subject to George
8      Terwilliger's interpretation of what an AUSA should
9      normally do.  And when and if they get around to
10     doing their speech and debate review.
11          Now we have tried and tried.  And we're not
12     gonna try any more because it's pointless.  We've
13     offered direct use immunity.  We have said, let's
14     talk about a direct rolling production with a
15     specific time frame for compliance.  And we've
16     gotten nowhere.
17          He still won't tell you -- you asked him
18     another direct question and you've not gotten a
19     direct answer.  When are you going -- what have you
20     done with speech or debate privilege?  In order to
21     assert a privilege you have to assert it properly.
22     You can't do it blanketly.  And you have to go
23     through the stuff, you have to create a privilege
24     log as to that which you are asserting a privilege
25     over, and you have to prove that which -- you have

1    to provide that which is not privileged and which is

2    responsive.  And they haven't lifted a finger to do

3    that in months.

4        So, Your Honor, with respect to the remaining

5    issue of campaign records, we are prepared to

6    present to you that we have not gotten all the

7    campaign records.  What we have said is we -- we do

8    not expect Mr. Schock to reproduce those records

9    that were seized from the campaign office.  What we

10   have not said is that he is relieved of any

11   obligation to produce campaign records that he

12   himself has or that someone else, the campaign

13   entities, have.

14       And his own transmittal letters reflect; if I

15   may approach, Your Honor?

16           THE COURT:  You may.

17           MR. BASS:  His own transmittal letters,

18   which are part of what I've marked as Government

19   Exhibit B, reflect that Mr. Schock didn't start

20   producing any campaign records himself.

21       And Your Honor already ruled that you don't --

22   you can't convert representative records into

23   personal records by just taking them home or having

24   someone give them to you.

25       Mr. Schock did not begin to produce any

campaign records until July the 14th; eight days
after Your Honor's deadline.

And in contrast to Your Honor's order of
July 6th, he took it upon himself to define Your
Honor's order.  And then go on to say, in a manner
I've not seen before, I'm producing these but I'm
not waiving any privilege.  And then to self-declare
that the documents are going to be produced on a
rolling basis without any indication how much there
are or when their finally compliance will be done.

Now, in the absence of a finding by Your Honor
today that he is in civil contempt of Your Honor's
order with respect to campaign records, and the
imposition of a remedy for that, in the absence of
that, the Government's only recourse is to come back
to you, ex parte, and seek a search warrant for his
residence and anywhere else that we can establish
probable cause where these records might be.  And we
would fully intend to do that if we can meet that
burden.

That's our only other option.  In the absence
of proceeding today on the issue of the campaign
entity order and in the absence of a finding by Your
Honor that he is in contempt and a remedy imposed,
that's our only option.

1        MR. TERWILLIGER:  Your Honor, just on this

2   Exhibit B; for the sake of clarity in the record.

3   This is a transmittal letter of records being

4   produced pursuant to the subpoena served personally

5   on Mr. Schock.  That production is pursuant to the

6   immunity agreement that we reached.  And that letter

7   was not agreed upon and tendered to us until, I

8   believe it was July 10th.  So -- and we promptly

9   began to produce these records after that was agreed

10  to on July 10th.

11        I don't -- you know, we can stand here all day

12  and argue about why it took so -- that much time to

13  get there.  I don't know that that gets us anywhere.

14  But this has nothing to do with the campaign

15  records.  This is the personal records.

16        Now, if there were campaign records in

17  Mr. Schock's personal possession; as opposed to

18  these Jones Day records; you know, if he had some at

19  home or something like that, we have told the

20  Government and we recognize over and over, of course

21  there would be an obligation to produce those.

22  We're not stupid enough to obstruct justice or

23  something.

24        So I'm not sure why Mr. Bass is even giving

25  this -- this to you.  And the reservations in the

```
1    letter, as far as I know, are typical, usual things.
2        Your Honor, may I have one moment?  To confer
3    with my colleagues?
4            THE COURT:  Do you want to take a five
5    minute break?
6            MR. TERWILLIGER:  I don't even think it
7    will take that long, but if Your Honor wants to,
8    certainly.
9            THE COURT:  Well, you probably need to tell
10   people across the hall what we're doing.
11           MR. TERWILLIGER:  Well, that's what I want
12   to talk about.
13           THE COURT:  All right.  We'll take a five
14   minute break.
15           MR. TERWILLIGER:  Okay.  Thank you.
16           THE COURT:  Go ahead.
17           MR. TERWILLIGER:  Your Honor, on the
18   campaign records, we have a couple of witnesses
19   here.  And since this is suppose to be a factual
20   hearing, that we believe their testimony would be
21   relevant, so we would like to call them.
22           THE COURT:  That's what I was going to
23   suggest.  We will give the Government seven days to
24   respond to the amicus brief.
25           MR. BASS:  Yes, Your Honor.  I guess just
```

1    in terms of procedurally, that you have taken the

2    filing of the amici brief as a motion to reconsider

3    your ruling?

4         THE COURT:  Yes.

5         MR. BASS:  And -- which you've orally

6    indicated.  And the Government would have seven days

7    to basically ask Your Honor to reconsider her

8    reconsideration and brief that.  And if --

9         And we would further ask that if Your Honor

10   would entertain our motion for reconsideration, that

11   we would reset this hearing.  Procedurally that

12   would be what we would --

13        THE COURT:  You would prefer not to take

14   the testimony as to the production of the campaign

15   records?

16        MR. BASS:  No.  We -- in the -- I think

17   procedurally, with respect to campaign records, it's

18   the Government's burden to prove there was an order

19   and it hasn't been complied with.  That's our burden

20   first.

21        So in the absence of a stipulation that there's

22   an unequivocal order and that it has not been

23   complied with, then I think we have to present at

24   least some evidence or point Your Honor to some

25   evidence in that regard before Your Honor considers

1    whether or not to hear any evidence from Mr. Schock.

2         THE COURT:  Do you concede any of these

3    issues that Mr. Bass raises?

4         MR. TERWILLIGER:  Well, I'm not sure what

5    they are.  The stipulations that Mr. Bass sent to us

6    before about this were all sort of legal conclusions

7    of what he would purport to prove.  If they had just

8    been factual in nature I think we would look at them

9    differently.

10        But, you know, on the campaign records, Your

11   Honor, I thought the Government met its burden by

12   your issuance of a show cause order.  And what we

13   were here to do today was for us to demonstrate or

14   attempt to demonstrate just cause for not having

15   produced the campaign records.

16        We've had detailed legal argument on whether or

17   not there's a privilege and all of that sort of

18   thing.  So I'm not sure what it is the Government

19   wants to do.

20        We -- the specter has been raised that somehow

21   there's some loose campaign records out there that

22   are in Mr. Schock's possession that haven't been

23   produced.  I think that's what the argument is.  And

24   we're prepared to present testimony about what has

25   been produced through the campaign.

1        The other thing I wanted to mention, Your

2    Honor, just while we're on the procedural issue of

3    the hearing.  If Your Honor is going to, as you've

4    just indicated you are, entertain further briefing

5    on the collective entity issue, we do have some

6    testimony to present here today from a couple of

7    witnesses.

8        And I would suggest; but you know, this is

9    totally your call, of course, Your Honor; that as

10   long as they're here, you might as well hear the

11   testimony and then it will be in the record,

12   regardless of what you decide based on further

13   briefing.

14           THE COURT:  Did you wish to reply to

15   whatever the Government files?

16           MR. TERWILLIGER:  Probably.  I won't say

17   for certain, but probably, Your Honor.

18           THE COURT:  All right.  So we'll give seven

19   days, whether the amicus wants to file anything as

20   well.

21           MR. TERWILLIGER:  Thank you, Your Honor.

22           THE COURT:  Seven days from the filing of

23   Mr. Bass.

24        Mr. Coffield has stepped in.

25        I believe my prior opinion actually said that

1  the Government had made its preliminary showing, so

2  that the burden would shift at this point to

3  Mr. Terwilliger.  Or to your client.

4          MR. BASS:  Your Honor, I think --

5          THE COURT:  I'm happy to let you establish

6  again, if that's what you wish to do.

7          MR. BASS:  I would, Your Honor, because

8  your renewed order gave a specific deadline of

9  July 6th.

10         THE COURT:  It did.

11         MR. BASS:  So I think I'd like to present

12 some brief evidence with respect to whether or not

13 there's been compliance with that subsequent order.

14         THE COURT:  That's fine.

15         MR. BASS:  And with that, Your Honor, I

16 would move to admit Government Exhibit B; what I

17 presented.  This is a letter from counsel for

18 Mr. Schock to the Government dated July 14th and

19 July the 23rd, I believe.

20         THE COURT:  Any objection?

21         MR. TERWILLIGER:  I'm sorry, were your

22 waiting for me, Your Honor?

23         THE COURT:  Yes, I was.

24         MR. TERWILLIGER:  I apologize, I'm sorry.

25 I was on to the next step.  No objection.

COLEMAN - DIRECT                    56

1            THE COURT:  All right.  Your evidence,

2   Mr. Bass?

3            MR. BASS:  With that, we call Mr. Coleman,

4   Your Honor.

5            THE COURT:  Mr. Coleman, if you'll step up

6   and be sworn.  And you have no objection to

7   Mr. Coffield being in the courtroom at this time,

8   since it is open?

9            MR. BASS:  No, Your Honor.

10            THE COURT:  And Mr. Coffield, if you'd like

11   to be seated at counsel table, you're welcome to be.

12            MR. COFFIELD:  I'm very happy back here,

13   Your Honor.

14            THE COURT:  I bet you are.

15        (The witness was sworn.)

16            THE COURT:  We have a short in the

17   microphone so I'll move it over so you don't get

18   shocked.

19                    BERNARD COLEMAN

20   called as a witness herein, having been duly sworn,

21   was examined and testified as follows:

22                    DIRECT EXAMINATION

23   BY MR. BASS:

24      Q.  Sir, could you tell us your name, please?

25      A.  Bernard Coleman.

1        Q.  Mr. Coleman, how are you employed?

2        A.  I'm a financial analyst with the United

3   States Attorney's Office.

4        Q.  And have you been involved in matters, at

5   least to some extent, involving investigation of

6   Mr. Schock?

7        A.  Yes, I have.

8        Q.  Madam Clerk, would you be so kind, would the

9   camera be on.

10       Mr. Coleman, are you familiar with Government's

11  Exhibit B here, the transmittal letters dated

12  July -- the first one here dated July 14th.  Are you

13  familiar with those?

14       A.  Yes, I am.

15       Q.  And then are you also familiar with the

16  receipt by the Government of a disk that was

17  attached, or a photocopy of a disk that was attached

18  to the transmittal letter?  Production 1?

19       A.  Yes, I am.

20       Q.  Have you begun to review the contents of the

21  Production 1 disk?

22       A.  Yes, I have.

23       Q.  And attached to the transmittal letter was

24  there an agreement dated July 10th between the

25  Government, counsel for Mr. Schock, and Mr. Schock

1  individually?

2       A.  Yes, there was.

3       Q.  Is that dated July 13th?

4       A.  Yes, the signatures are July 13th.

5       Q.  And is there a paragraph in the second page

6  of the letter beginning with "the Government will be

7  free..."  Is that part of the agreement?

8       A.  Yes, it is.

9       Q.  Is there anything in that letter that you

10  see that allows for reservation of any privileges?

11            MR. TERWILLIGER:  Objection, Your Honor.

12  The letter speaks for itself.

13            MR. BASS:  Agreed.  I'll move on, Your

14  Honor.

15  BY MR. BASS:

16       Q.  Is there also attached to that first

17  transmittal letter a photocopy of a second disk

18  identified as Production 2?

19       A.  Yes, there is.

20       Q.  Now, have you begun to review each of --

21  either one or both of these disks?

22       A.  I have opened every pdf on Disk 1 and Disk

23  2.  I haven't had a chance to review every page of

24  all the pdfs in total detail, but I generally know

25  what's on those disks.

COLEMAN - DIRECT                    59

1      Q.  And can you -- first of all, was there any

2  index or identification on the disk as to what the

3  contents of it were or was?

4      A.  No, there was not.

5      Q.  So can you just tell the Court how -- what

6  the contents -- was it a series of pdf files?

7      A.  Yes, it was.

8      Q.  Approximately how many?

9      A.  Disk 1 had a lot of pdfs on it, because a

10  lot of them were two page documents.  Disk 2 had a

11  lesser number, they were larger documents.

12          MR. TERWILLIGER:  Your Honor, I hesitate to

13  do this so soon into this testimony, but I object.

14  And would move to strike this witness.

15      This is about the delivery of the records

16  pursuant to the personal subpoena and the immunity

17  letter, which was signed after July 6th.  I don't

18  see how it has anything to do with any matter that's

19  in issue today.

20          THE COURT:  I don't either, Mr. Bass.

21          MR. BASS:  Your Honor, in order for

22  Mr. Schock to produce campaign records, wherever

23  they are, in his representative capacity.  Now

24  whether he has them in his house, whether he had

25  someone transmit them to him, whether he took them

1   from someplace, he's been ordered to produce all

2   campaign records.

3       And the purpose of presenting this exhibit and

4   calling Mr. Coleman is he's gonna testify that there

5   are campaign records that were on these disks.  And

6   that the complete compliance by Mr. Schock of

7   producing all campaign records has not been

8   completed.

9       That's the purpose.

10          MR. TERWILLIGER:  Well, I mean --

11          MR. BASS:  He has campaign records in his

12  possession that he's not produced that you have

13  ordered him to produce.

14          MR. TERWILLIGER:  I find this hilarious,

15  Your Honor.  I mean he's going to prove that we

16  haven't produced records by the fact that we have

17  produced records?

18      Obviously this witness can't testify to what he

19  hasn't produced that may be in his possession.  If

20  he's -- if the point of the testimony is that he has

21  produced records from his personal possession that,

22  at least according to Mr. Basin, include "campaign

23  records," I'm not sure what that means.  You know,

24  we'll stipulate to that, but...

25          MR. BASS:  I'm sorry, you stipulate to

COLEMAN - DIRECT                    61

 1   what?

 2           MR. TERWILLIGER:  That Mr. Bass has

 3   produced whatever is on these documents.  And if

 4   some of those documents are campaign records, that

 5   he is in fact producing them as we said he would

 6   produce them.

 7           MR. BASS:  Mr. Schock?

 8           MR. TERWILLIGER:  Mr. Schock.

 9           MR. BASS:  Has produced campaign records?

10   Is that --

11           MR. TERWILLIGER:  Well, Your Honor, I'm not

12   gonna get into what's a campaign record and what

13   isn't a campaign record.  This witness wouldn't be

14   competent to say what is a campaign record and what

15   isn't a campaign record either.

16      He's produced whatever is on these disks.  I

17   don't see what this production pursuant to the

18   personal subpoena has anything to do with matters in

19   issue here.

20           MR. BASS:  Your Honor, I don't know how we

21   show you that he's not complied with your order to

22   produce campaign records without calling someone to

23   testify to what he has produced and that they are

24   campaign records and production is not complete.

25           THE COURT:  The objection is overruled.

COLEMAN - DIRECT                    62

1    You may proceed.

2    BY MR. BASS:

3        Q.  Can you just describe generally,

4    Mr. Coleman, what was the nature of the records that

5    you reviewed that were in pdf format?

6        A.  In Disk 1 it was primarily personal bank

7    account statements and tax return information for

8    Mr. Schock from 2010 to 2014.

9        Disk 2 contained American Express statements,

10   leases for a property purchased from Mr. Green.  And

11   none of the American Express charge statements that

12   were on Disk 2 contained any notations as to who the

13   expenses were for or which organization they were

14   for.

15       Q.  Were there any records -- now, with respect

16   to the Production 1 and 2 disks, were they Bates

17   stamped, Bates numbered?

18       A.  Yes, they were.

19       Q.  And is that what is identified here in the

20   transmittal letter; Bates Stamp Number 01 through

21   1408?

22       A.  Yes.

23       Q.  And on July 23rd was there a second

24   transmittal letter?

25       A.  Yes, there was.

1      Q.  And was there a disk associated with that as

2   well?

3      A.  There was.

4      Q.  And have you reviewed that disk?

5      A.  I just received that disk earlier today and

6   I started reviewing it, but I have not completely

7   reviewed the entire disk.

8      Q.  Did it also have on it pdf documents?

9      A.  It did.

10      Q.  Did it have any documents that had any

11   references to campaign entities?

12      A.  Yes.

13      Q.  What kinds of documents were those?

14      A.  They were primarily fundraising records.

15   The ones I've seen so far dealing mostly with

16   Generation Y Fund and Schock for Congress.  And also

17   the National Republican Central Committee, which was

18   NRCC.

19      There's also, with the pdfs, there are some

20   spreadsheets also attached.  There's no index of

21   what the documents are and the spreadsheets, some of

22   them are not titled, so it's difficult to tell what

23   event they may relate to.

24      Q.  But are there some documents that you've

25   reviewed so far that contain references to campaign

COLEMAN - CROSS                    64

1  entities that you just mentioned?

2      A.  Yes, there are.

3          MR. BASS:  That's all the questions I have,

4  Your Honor.

5          THE COURT:  Do you have any cross, Mr.

6  Terwilliger?

7          MR. TERWILLIGER:  Please.  Thank you, Your

8  Honor.

9                    CROSS EXAMINATION

10  BY MR. TERWILLIGER:

11      Q.  Do you know if these materials have been

12  presented to the Grand Jury?

13          MR. BASS:  Your Honor, objection to that,

14  as to inquiring what are matters occurring before

15  the Grand Jury.

16          MR. TERWILLIGER:  I'm not asking about

17  matters occurring before the Grand Jury.  There's a

18  Justice Department requirement that financial

19  records that are subpoenaed by Grand Jury subpoena

20  be presented to the Grand Jury and I'm just asking

21  if they were.

22          MR. BASS:  Of financial institutions, not

23  from records from an individual.  And again, it has

24  nothing to do with -- it is a matter occurring

25  before the Grand Jury and it has nothing to do with

```
 1   whether --
 2           MR. TERWILLIGER:  Your Honor, I'll withdraw
 3   the question.  It's not that -
 4           THE COURT:  All right.  Thank you.
 5           MR. TERWILLIGER:  Hold on just a second,
 6   please.
 7   BY MR. TERWILLIGER:
 8       Q.  The records that you referred to,
 9   Mr. Coleman, as referring to campaign entities, is
10   that what you said?  You saw records referring to
11   campaign entities?
12       A.  Or they were from a campaign entity.
13       Q.  How did you -- how could you tell they were
14   from a campaign entity?
15       A.  Well, for instance, one that I recall was
16   for a fund-raiser in Las Vegas for over a weekend
17   that pertained to giving so much money and with that
18   donation then you were allowed to purchase Country
19   Music Award tickets and either be seated or be in
20   the pit.  There was a description of that.
21       Q.  So it was a solicitation to participate in a
22   campaign event?
23       A.  Yes.
24       Q.  And was it on the letterhead of a campaign
25   or something like that?
```

COLEMAN - CROSS                            66

1        A.  I actually might have that document in a

2   binder back there --

3        Q.  I'm just asking --

4        A.  I can't remember if it was or not.

5        Q.  Do you know whether it was a draft or an

6   original, for example?

7        A.  I believe that it probably was sent out to

8   customers because --

9        Q.  I'm not asking what you believe; excuse me,

10  Mr. Coleman; I'm just asking if you know whether or

11  not it was a draft or looked like something that was

12  final?

13       A.  It looked like something that was sent out

14  to people because there were also responses from

15  donors with that.

16       Q.  Okay.  Thank you.

17       The spreadsheets that you referenced seeing

18  where they were not titled; you have no idea whether

19  they are from a campaign or some record kept by a

20  campaign I would take it?

21       A.  From what I could tell it looks to me like

22  some of them contained donors; donor's names,

23  donor's addresses, donor's e-mail.  So I -- I would

24  say they are campaign type spreadsheets.  And some

25  of them also look like they might have been tracking

1  expenses and receipts, but you couldn't tell what

2  event they went to since they're not titled.

3      Q.  I take it that in your -- in your job,

4  Mr. Coleman, you work with records a lot; fair to

5  say?

6      A.  Yes, sir.

7      Q.  And you recognize, I'm sure, that records on

8  their face can sometimes tell us very little about

9  who prepared them or what they were for or other

10  things that may eventually be important in a given

11  case; correct?

12      A.  Yes.

13      Q.  And these spreadsheets, for example, that

14  you just said looked like to you they could be

15  campaign records; you really have no idea who

16  prepared those, do you?

17      A.  I do not.

18      Q.  And you don't know whether they were ever in

19  the possession of any campaign organization or

20  whether they were prepared by an accountant or

21  prepared by Mr. Schock for that matter?

22      A.  That's a three part question.  I would say

23  for the first one, it looks like they were in the

24  hands of somebody affiliated with that campaign

25  office.

COLEMAN - CROSS                    68

1      Q.  Well, what about the documents makes it look

2  that way?

3      A.  The fact that it's tracking -- appears to be

4  tracking incoming expenses related to some of the

5  fund-raisers that --

6      Q.  Okay.  So you're -- you're deducing by the

7  information that's reported in there that that would

8  be relevant to the campaign, I take it; is that your

9  deduction?

10      A.  Well, also I -- in those documents I saw

11  some names of individuals who I know have given

12  money to one of his entities.  So from that -- from

13  that knowledge I know that it pertains to the

14  campaign -- one of the campaign entities.

15      Q.  Right.  But my point is, in your

16  professional work you recognize, of course, that

17  it's important and there's an important distinction

18  to be made between a record that may pertain to a

19  campaign activity, for example, and a record that is

20  made by that campaign and would belong to it;

21  correct?

22      A.  Yes.

23          MR. TERWILLIGER:  I don't have anything

24  further, Your Honor.

25

1          THE COURT:  Redirect.

2              REDIRECT EXAMINATION

3  BY MR. BASS:

4     Q.  Mr. Coleman, are you familiar with the

5  records that were -- at least in part, the records

6  that were seized from the search of the campaign

7  office in Peoria?

8     A.  Yes, in part.

9     Q.  Are you aware of whether or not -- you

10  mentioned an American Express account, is that --

11          MR. TERWILLIGER:  Your Honor, I don't know

12  what kind of rules you want to use for this

13  proceeding, but this is opening a new subject matter

14  that's beyond the scope of the direct and certainly

15  not rebuttal to anything he was crossed about.  But

16  if Your Honor wants to leave it relatively loose,

17  I'll withdraw the objection.

18          THE COURT:  Well, I don't think that's

19  keeping it loose.  The objection is overruled.  You

20  may proceed.

21     Q.  Mr. Terwilliger asked you about whether you

22  understood the difference between what was

23  originated from a campaign or whether it was

24  related, I believe was the question.  And so I'm

25  asking you, are you familiar with the types of

1    records that were seized from the campaign office in

2    Peoria?

3         A.  Yes.

4         Q.  Are you familiar with the types of records

5    that the campaign was required to maintain and

6    submit to its treasurer and report to the Federal

7    Election Commission?

8         A.  Yes.

9         Q.  Are you familiar with whether or not, as to

10   that American Express account, whether one or more

11   of Mr. Schock's campaign staffers and house staffers

12   had their own individual card in their individual

13   names under his personal American Express account?

14        A.  They did.

15        Q.  Did several of them have their own American

16   Express card in their name under Mr. Schock's

17   personal American Express account?

18        A.  Yes.

19        Q.  And were there American Express records

20   seized during the course of the search of the

21   campaign office?

22        A.  Yes, there was.

23        Q.  And as part of those records that were

24   seized were there handwritten notations on them?

25        A.  On those records there were handwritten

1    notations.

2        Q.  What was the purpose of -- or what did --

3    what does -- what do the notations on the American

4    Express card appear to reflect?

5        A.  The American Express card in the month would

6    have numerous charges on it.  The charges would be

7    paid for by three or four different entities, one of

8    them being Mr. Schock personally, one of them being

9    Schock for Congress, Schock Victory Committee,

10   Generation Y may all make a payment on a given

11   monthly American Express card.

12       So it's important to us to have those notations

13   to track what we're looking at.

14       Q.  So in addition to records that had at least

15   campaign entities' names on them; is that right?

16   Were there some records that had the names of one or

17   more of the campaign entities on them?

18       A.  Which records are we talking about?

19       Q.  The records that were -- you reviewed on

20   Transmittal 1 and 2, on the CDs from Mr. Schock.

21   Were there records that contained references to the

22   campaign entity names?

23       A.  Yes.  And actually there was some documents

24   where maybe an individual had given money and they

25   were worried about the limits of who they could give

COLEMAN - RECROSS                    72

```
1   money to and which entity it should go to.  So there
2   were -- there were documents along that line also.
3        Q.  Were there American Express records in
4   there?
5        A.  In Disk 1 it may have had a small amount.
6   Disk 2 did have American Express records.
7        Q.  Any of the records that you reviewed, did
8   any of them have any notations on them?
9        A.  They did not.
10           MR. BASS:  That's all I have, Your Honor.
11           THE COURT:  Anything further?
12           MR. TERWILLIGER:  I'll be brief, Your
13   Honor.
14                RECROSS EXAMINATION
15   BY MR. TERWILLIGER:
16        Q.  You don't have any reason to believe that
17   any of these so-called campaign records that you saw
18   on these disks hadn't already been produced by the
19   campaign or seized pursuant to the search warrant?
20   You wouldn't know one way or the other; correct?
21        A.  I have not looked at every document that was
22   taken in the search warrant, so I don't know if I
23   can answer that question.
24        Q.  Well, I would think you could answer the
25   question because it's -- it's -- you don't have any
```

1    reason to believe that any of these documents were

2    not produced by the -- otherwise in the Government's

3    possession by virtue of the campaign's production or

4    the -- or the results of the seizure of the search

5    warrant?

6        A.  There's documents that I think we are still

7    looking for that I have not seen in either one of

8    those.

9        Q.  Do you have any reason -- let me try to put

10   it the other way.  Do you have any reason to

11   believe, any basis for a factual conclusion that any

12   of the records you've received on the disks are not

13   copies that came from the campaign organization?  If

14   they're so-called campaign documents?

15       A.  Can you ask me that one more time.

16       Q.  Certainly.  Among those records that you are

17   apparently identifying from the disk as campaign

18   records, you don't have any way to know whether or

19   not those records were also produced either by the

20   campaign or in the Government's possession by virtue

21   of the search warrant?

22       A.  I do not.

23            MR. TERWILLIGER:  Okay.  I don't have

24   anything else, Your Honor.

25            THE COURT:  Mr. Bass.

1          MR. BASS:  Just to complete that line of

2    questioning.

3                    REDIRECT EXAMINATION

4    BY MR. BASS:

5        Q.  In the course of your review of the American

6    Express records and the seized records, did there

7    appear to have been an e-mail, a constant e-mail,

8    source of e-mail traffic between Mr. Schock and his

9    campaign entities and staffers, at least with

10   respect to the charges on the American Express card

11   and how they were identified as personal or campaign

12   paid for?

13          MR. TERWILLIGER:  Objection to the form of

14   the question, Your Honor, because I can't tell what

15   it is.

16          MR. BASS:  I'll rephrase.

17          THE COURT:  Thank you.

18   BY MR. BASS:

19       Q.  Was the -- was the American Express card,

20   based on your review of campaign reporting

21   documents, review of the seized documents, was the

22   American Express card of Mr. Schock personally, with

23   separate cards issued in the name of his staffers,

24   was that an important part of the way in which

25   campaign expenses were paid for?

1           MR. TERWILLIGER:  Your Honor, I don't think

2    he's competent to testify what was an important part

3    of something of that nature.  Objection.

4           Q.  I'll rephrase.

5           Were there regular expenses of the campaigns

6    paid for with Mr. Schock's American Express card?

7           A.  Yes.

8           Q.  And did there appear to be, based on the

9    notations and the cards in individual staffer's

10   names, at least some e-mail traffic between all of

11   these people to account for those expenditures and

12   the placement of those notations on the bills?

13          A.  There were -- I actually saw an e-mail on

14   one of the disks today from Rachel Honegger to Aaron

15   Schock advising him of how she was gonna make the

16   payment on the card and was that okay with him.

17          And then we also had some e-mails to him from

18   staffers specifically asking how some expenses

19   should be handled.

20          Q.  So do you have any way of knowing, in

21   response to Mr. -- Mr. Terwilliger's question,

22   whether the seizure of the records just from the

23   Peoria office resulted in the complete production of

24   all campaign-related records, including the American

25   Express records?  Do you have any way of knowing

1   that?

2       A.  No, I don't.

3           MR. TERWILLIGER:  Nothing further, Your

4   Honor.

5           MR. BASS:  Thank you, Your Honor.

6           THE COURT:  Go ahead.  Thank you.

7       (The witness was excused.)

8           THE COURT:  Let me ask in terms of

9   Mr. Coffield sitting back here; is Mr. Roman sitting

10  somewhere in Washington D.C. waiting to testify?

11          MR. COFFIELD:  Yes, he is, Your Honor.

12          THE COURT:  Mr. Bass, who --

13          MR. BASS:  Your Honor, I think for purposes

14  of establishing our prima facie case with respect to

15  your second order, I believe we have done that.  I'm

16  happy to go further if Your Honor disagrees.

17          THE COURT:  No, I don't disagree.

18          MR. BASS:  But if -- in light of that, I

19  think we can excuse Mr. Roman.

20       I'm not sure that -- I don't know what

21  Mr. Terwilliger's going to do, but we have

22  Mr. Kilgore out there -- here personally as well.

23  And to try to reduce the amount of inconvenience to

24  the witnesses, I think I can at least excuse

25  Mr. Roman at this point.

1          THE COURT:  Okay.  And for the record, I

2     think you had prior to this time made a prima facie

3     case.  I think you've made a prima facie case today

4     in addition.

5          And Mr. Coffield, if you'd like to call

6     Mr. Roman and your co-worker, Mr. White, and tell

7     them they're excused at this time.

8          MR. COFFIELD:  Thank you, Your Honor.

9          THE COURT:  Thank you, sir.

10        Your first witness, Mr. Terwilliger.

11         MR. TERWILLIGER:  Your Honor, there's one

12    witness who has a bit of a timing issue on a family

13    matter that's related to the collective entity

14    stuff.  That's Mr. Mackaman.

15        Would Your Honor permit us to call him first,

16    even though it doesn't pertain to the campaign

17    records, so that he can be excused.

18         THE COURT:  Will he be very long?

19         MR. TERWILLIGER:  I don't think so.

20         MR. LANG:  I think 15 minutes, Judge.

21         THE COURT:  Okay.  That's fine.

22         MR. LANG:  We call Frank Mackaman.

23         THE COURT:  We don't have anyone to get

24    him.  You need to send somebody.

25         MR. TERWILLIGER:  I'll get him.

MACKAMAN - DIRECT                    78

```
 1              MS. EGAN:  I'll get him.

 2              THE COURT:  Okay.  So for the record,

 3    Mr. Mackaman's testimony will not pertain to the

 4    campaign records, it will pertain to the collective

 5    entity issue, which may or may not be relevant as to

 6    my ultimate ruling?

 7              MR. LANG:  That's correct, Judge.  Since

 8    Your Honor has allowed time for further briefing and

 9    Mr. Mackaman has taken the time out to come up.

10              THE COURT:  If you will please swear the

11    witness.

12         (The witness was sworn.)

13              THE COURT:  Our microphone has a short, so

14    I'll take the hit.

15         Please proceed.

16                   FRANK H. MACKAMAN

17    called as a witness herein, having been duly sworn,

18    was examined and testified as follows:

19                   DIRECT EXAMINATION

20    BY MR. LANG:

21         Q.  Good afternoon, sir.  May I proceed, Judge?

22              THE COURT:  You may.

23         Q.  Could you please state your name for the

24    record?

25         A.  Frank H. Mackaman.
```

MACKAMAN - DIRECT                    79

1       Q.   And in what city do you reside, sir?

2       A.   Pekin, Illinois.

3       Q.   Are you employed?

4       A.   I am.

5       Q.   And where are you employed?

6       A.   At the Dirksen Congressional Center.

7       Q.   All right.  We're gonna talk about your work

8    at the Dirksen Congressional Center in a minute, but

9    first can we talk about your educational background?

10      A.   Yes, sir.

11      Q.   Do you have an undergraduate degree?

12      A.   I do, from Drake University.

13      Q.   And what was your major?

14      A.   History and geography.

15      Q.   Do you have any advanced degrees, sir?

16      A.   I have two.  I have a Masters degree and a

17   Ph.D., both in American history.

18      Q.   All right.  And where did you get those?

19      A.   University of Missouri at Columbia.

20      Q.   Now, can you tell her -- the Court what the

21   Dirksen Congressional Center is?

22      A.   Sure, the Dirksen Center is a non-profit --

23           THE COURT:  I'm aware of what it is.  I

24   mean, feel free to make your record, but -- go

25   ahead.

MACKAMAN - DIRECT                    80

1          Q.  That's fine, we can get right to it.  That's

2     fine.

3          But for the record, does it contain the records

4     and papers of any former members of Congress?

5          A.  Yes.  We have the papers of former House

6     members from 1933 through Ray LaHood's term.

7          Q.  And are those the papers of the -- what is

8     now -- of the former members who represented what is

9     now the 18th Congressional District?

10         A.  That's correct.

11         Q.  All right.  And by name does that include

12    Senator -- the late Senator Everett McKinley

13    Dirksen, Congressman Harold Velde, Congressman

14    Robert Michael, and Congressman Ray LaHood?

15         A.  Yes, sir.

16         Q.  All right.  How long have you been working

17    at the center?

18         A.  I have worked there for two different times.

19    From 1977 to 1987.  And from 1995 to present.

20         Q.  Were you working during the interim period

21    that you weren't at the Dirksen center?

22         A.  Yes.  I was working at the Gerald R. Ford

23    Presidential Library and Museum.

24         Q.  What were you doing at the Gerald R. Ford

25    Presidential Museum?

MACKAMAN - DIRECT                    81

1          A.  I was initially hired as the Deputy Director

2     and Curator at the museum in Grand Rapids.  And then

3     after about a year and a half, applied for and was

4     appointed director, moved to Ann Arbor where the

5     library is housed.

6          Q.  Now -- and then you came back to the Dirksen

7     Center --

8          A.  Yes.

9          Q.  -- in Pekin, the Dirksen Congressional

10    Center, in 1995?

11         A.  Yes, sir.

12         Q.  While you were in Michigan were you

13    affiliated at all with the University of Michigan?

14         A.  Yes.  I had a regental appointment as a

15    professor of history and I was a visiting lecturer

16    in the Department of Political Science.  So I taught

17    courses in the American presidency.

18         Q.  Great.  Now, have you been published?

19         A.  Yes, sir.

20         Q.  Can you tell the Court a little bit about

21    your publications?

22         A.  I think my first full-length publication was

23    Understanding Congressional Leadership, The

24    State-of-the-Art, which was published by

25    Congressional Quarterly Press.  It was the result of

1    a conference that the Dirksen Center sponsored.  And

2    I've contributed to professional journals and

3    articles in volumes ever since throughout my career.

4         Q.  Are you continuing to publish now?

5         A.  Yes.  As a matter of fact, I'm working right

6    now with Ray LaHood on his memoir, which will be

7    published in October this year.

8         Q.  Have you prepared a CV or resume which lists

9    out your publications?

10        A.  Yes.  The short version, thankfully.

11        Q.  May I approach, Judge?

12            THE COURT:  Yes, you may.

13        Q.  Showing you what's been marked as Exhibit 5,

14   could you take a look at that?

15        A.  Yes.

16        Q.  Do you recognize what Exhibit 5 is?

17        A.  Yes, I do.

18        Q.  What is Exhibit 5?

19        A.  This is my resume that I use.

20        Q.  All right.  Is it a true and accurate

21   summary of your educational background, employment,

22   publications, selected professional community

23   activities, et cetera?

24        A.  Yes, sir.

25        Q.  All right.  Also in detail about the service

MACKAMAN - DIRECT                    83

1    as mayor, et cetera?

2        A.  Yes, sir.

3        Q.  All right.  This time I'd offer Exhibit 5,

4    Judge.

5            MR. BASS:  No objection.

6            THE COURT:  I'm sorry, were you saying you

7    were mayor?

8        A.  Yes, I was.

9        Q.  Mayor of what city?

10       A.  Pekin, Illinois, for 18 months.

11       Q.  All right.  Great.

12           THE COURT:  I'm going to add to the sticker

13   that this is Schock Exhibit 5.  It's just marked

14   Schock Exhibit 5.

15       Is there any objection to its admission?

16           MR. BASS:  No, Your Honor.

17           THE COURT:  It's admitted and so marked.

18       (Schock Exhibit 5 was admitted.)

19   BY MR. LANG:

20       Q.  And then the center of the page, the

21   publications, it lists out 10 or 12 different lines

22   worth of different publications; is that correct?

23       A.  Yes, sir.

24       Q.  And according to this, you've been involved

25   in professional associations as well?

MACKAMAN - DIRECT                    84

1        A.   That's correct.

2        Q.   Could you briefly summarize that?

3        A.   Well, currently I'm immediate past president

4   and member of the executive committee of the

5   Association of Centers for the Study of Congress.

6        I'm a long-time member of the Society of

7   American Archivists, the Congressional Papers

8   Roundtable, which is a section of the Society of

9   American Archivists.  I've been a member of the

10  Midwest Archives Association.  So throughout my

11  career I've maintained an active involvement with my

12  profession.

13       Q.   All right.  And are any of those national

14  organizations?

15       A.   Yes, sir.  The Society of American

16  Archivists is and the Association of Centers for the

17  Study of Congress is, as is the Congressional Papers

18  Roundtable.

19       Q.   By your -- through your membership in those

20  organizations do you keep up on the policies,

21  procedures, the rules and the law concerning the --

22  what happens to the papers and records of

23  congressmen and former congressmen?

24       A.   Yes, sir.  So as an example, the Association

25  of Centers for the Study of Congress has an annual

1   meeting.  I've been the program chair, I believe

2   three times.  And we have regular sessions on not

3   only the research use of those collections, but also

4   the administrative and management responsibilities

5   for those collections.

6        Q.  All right.  I do have to mention I see on

7   here that you served on the Community Relations

8   Board for FCI Pekin; is that correct?

9        A.  Yes, sir.

10        Q.  All right.  Let's turn back to the Dirksen

11   Congressional Center if we can.  And describe what

12   you do?  I don't believe you told the Court what

13   your position is.

14        A.  I suppose we're unusual in that we do not

15   have titles at the Dirksen Center.  We're a small,

16   two and a half full-time equivalents.  Our other

17   full-time person works remotely from Seattle,

18   Washington.

19        So my responsibilities encompass the range of

20   research, educational, and archival programs at the

21   center.  In addition, I am the chief staff person.

22   I report to a Board of Directors and an Executive

23   Committee.

24        So really, I do everything that you would

25   expect of a small, non-profit organization.

1    Q.   But you're the chief manager of that?

2    A.   That would be correct; yes, sir.

3    Q.   All right.  Now, you mentioned earlier the

4  papers and records of every former member of

5  Congress who represented what is now the 18th

6  District; correct?

7    A.   Yes, sir.

8    Q.   All right.  What kind of papers and records

9  are you talking about?

10    A.   Each congressional collection is unique unto

11  itself.  That's one of the beauties of congressional

12  collections.  But they have certain common elements.

13  So constituent correspondence, constituent casework

14  is often the bulk of a collection; as it is with

15  most of our collections.

16      So in that you get people applying for

17  assistance in terms of getting Social Security

18  benefits, military benefits.  So there's constituent

19  casework.  There are legislative files.  So these

20  are bill files, testimony files.  There are speech

21  and trip files, or press files.  There are

22  appointment books.

23      So anything that you can imagine that a member

24  of Congress deals with day to day winds up in that

25  member's collection.

MACKAMAN - DIRECT                    87

1       Q.  All right.  How about financial data

2   concerning the member's office?

3       A.  Yes.  And also in many cases, but not all

4   cases, the records of the campaign office come to a

5   repository that collects congressional papers.

6       Q.  Okay.  But speaking of the papers and

7   documents of former members of Congress, it does

8   include financial information --

9       A.  Yes, it does.

10      Q.  -- claim forms --

11      A.  Yes, it does.

12      Q.  -- reimbursement forms, things like that?

13      A.  Yes.

14      Q.  All right.  Is it fair to say that the

15  records you have obtained, the center has obtained

16  from these former members of Congress includes just

17  about any aspect of the member's duties and

18  responsibilities?

19      A.  That's a fair characterization; yes.

20      Q.  All right.  Now, how were these gifts or

21  these papers and documents obtained by the center?

22      A.  In every case they were conveyed to the

23  center through a deed of gift or a similarly titled

24  document.

25      Q.  A gift?

MACKAMAN - DIRECT                              88

1        A.  Correct.

2        Q.  In the case of each of the former members of

3   Congress that you spoke about, you said you had

4   their records, okay?  Right?

5        A.  Yes.

6        Q.  And the records of each of those four

7   include the various type of papers and documents

8   that you described?

9        A.  Yes, hm-mm, that is correct.

10       Q.  All right.  So, for example, in the case of

11  Senator Dirksen, was there a formal transfer or gift

12  of papers and records from Senator Dirksen?

13       A.  Yes.  His case is a little unusual in that

14  he died in office.  So his widow, Luella Dirksen,

15  was the person who signed the deed of gift on behalf

16  of the Dirksen collection.

17       Q.  And the gifts of Senator Dirksen and each of

18  the other three former members of Congress that

19  you're talking about, those were personal gifts?

20  Gifts from them or their -- their spouse or

21  survivor; right?

22       A.  Yes, sir.

23       Q.  They weren't from the member's former

24  office, were they?

25       A.  No, sir.

MACKAMAN - DIRECT                    89

1      Q.  They weren't from the House or the Senate as

2  an entity, as entities, were they?

3      A.  That's correct; they were not.

4      Q.  Were they from any other organization or

5  entity except a personal gift from the former

6  member?

7      A.  They were all personal gifts.

8      Q.  All right.  So based on your expertise,

9  knowledge, work over all these years, who owned the

10  papers before they came to the Dirksen Center?

11      A.  The member.

12      Q.  All right.  I want to show you what's been

13  marked as Exhibit 6.  I'll go ahead and give you

14  Exhibit 6, 7, and 8, if I can, Judge.  Schock

15  Exhibits 6, 7, and 8.

16          THE COURT:  Thank you.

17      Q.  Start with 6 and 7 while I'm getting the

18  others.  Could you take a look at Exhibit 6.  Do you

19  recognize Exhibit 6?

20      A.  I do.

21      Q.  What is Exhibit 6?

22      A.  This is the confirmation of gifts of

23  personal papers and memorabilia signed by Everett

24  Dirksen's widow Luella Dirksen.

25      Q.  This is the gift which transferred the

MACKAMAN - DIRECT                    90

1   papers and records from Senator Dirksen's estate,

2   basically from his wife; right?

3        A.  Yes, that's right.

4        Q.  To the Dirksen Center?

5        A.  Yes, sir.

6            MR. LANG:  I'd offer Exhibit 6.

7            THE COURT:  Any objection?

8            MR. BASS:  No objection.

9            THE COURT:  6 is admitted and so marked.

10       (Schock Exhibit 6 was admitted.)

11  BY MR. LANG:

12       Q.  Could you take a look at Exhibit 7.

13       Well, actually let me go back to Exhibit 6.  Do

14  you have it in front of you, Exhibit 6?

15       A.  Yes, I --

16       Q.  I gave him an extra copy, Judge.

17       A.  Yes, I do.

18       Q.  Would you take a look at it, first page,

19  first line, says "I, Luella Dirksen, hereby

20  confirm;" right?

21       A.  Yes, sir.

22       Q.  And Luella Dirksen was the senator's wife?

23       A.  Yes.

24       Q.  And down about four lines, fifth line over

25  to the right it says, "And have transferred title,

MACKAMAN - DIRECT                    91

1    together with all literally -- literal -- literary

2    rights thereto effective as the dates of the

3    deliveries thereof to the fund?"

4         A.  Yes.

5         Q.  Is that a gift in your mind?

6         A.  Yes, it is.

7         Q.  Of private, personal property?

8         A.  Yes, sir.

9         Q.  And it even says just below what we just

10   talked about, "I own no interest in any of the

11   papers, memorabilia, historic materials now in the

12   possession of the center;" isn't that correct?

13        A.  Yes.

14        Q.  Next paragraph.  It says, "Title to all

15   other papers and memorabilia that I may hereafter

16   give or bequeath to the fund shall pass at the time

17   of the delivery thereto."  Correct?

18        A.  Yes, sir.

19        Q.  All right.  And that was signed on, if you

20   look at the second page, November 15th, 1976;

21   correct?

22        A.  Yes.

23        Q.  Is there any doubt in your mind this was the

24   passage of personal, private property?

25        A.  I have no doubt.

MACKAMAN - DIRECT                    92

1          Q.  All right.  Exhibit 7, could you take a

2     quick look at that.

3          Do you recognize Exhibit 7?

4          A.  Yes.

5          Q.  What is Exhibit 7?

6          A.  It's the certificate of gift from Harold H.

7     Velde, who was Dirksen's successor in the U.S. House

8     of Representatives.

9          Q.  All right.  Is this Exhibit 7 a true and

10    accurate copy of the written memorialization of this

11    gift to the center from Congressman Velde?

12         A.  Yes, it is.

13             MR. LANG:  I'd offer Exhibit 7?

14             THE COURT:  Any objection?

15             MR. BASS:  No objection, Your Honor.

16             THE COURT:  It's admitted and so marked.

17         (Schock Exhibit 7 was admitted.)

18         Q.  Looking at that -- do you have Exhibit 7 in

19    front of you?  Here you go.

20         Was that signed by Congressman -- former

21    Congressman Harold H. Velde on September 15th, 1977?

22         A.  Yes, sir.

23         Q.  Show you now what's been marked as

24    Exhibit 8.  Do you recognize Exhibit 8?

25         A.  Yes, I do.

MACKAMAN - DIRECT                93

1      Q.  What it is?

2      A.  This is the deed of gift from former

3  Congressman Robert H. Michael.

4      Q.  Okay.  This is the formal document

5  transferring property from Congressman Michael to

6  the Dirksen Congressional Center; is that correct?

7      A.  Yes, sir.

8      Q.  All right.  And was it signed by Congressman

9  Michael?

10     A.  Yes, it was.

11     Q.  Is this a true and accurate copy of the gift

12  of deed or its titled equivalent --

13     A.  It is.

14     Q.  All right.  I'd offer Exhibit 8, Judge.

15         THE COURT:  Exhibit 8.  Any objection?

16         MR. BASS:  No, Your Honor.  And if Mr. Lang

17  wants to move -- they're already filed of record

18  with their brief.  So if it will expedite things and

19  if he wants to move to admit all the exhibits he

20  wants to use with this witness, they are filed of

21  record, I have no objection.

22         MR. LANG:  That's fine.  I'd also offer

23  then without objection Exhibit 9.

24         THE COURT:  May I have --

25

MACKAMAN - DIRECT                    94

1    BY MR. LANG:

2        Q.  Handing you what's been admitted as

3    Exhibit 9.  Do you recognize Exhibit 9?

4        A.  Yes.  It's the certificate of gift governing

5    the donation of Ray LaHood's collection to the

6    Dirksen Congressional Center.

7        Q.  Okay.  Does that also reflect the gift, the

8    formalization of a gift of private property, the

9    private, personal effects of Ray LaHood to the

10   Dirksen Congressional Center?

11       A.  It does.

12       Q.  Any doubt about the fact that this was the

13   private property of Congressman LaHood?

14       A.  No doubt.

15       Q.  With respect to each of the four former

16   members of Congress and their gifts that you talked

17   about, were any of those delivered directly by the

18   House or -- well, by the House to the Dirksen

19   Center?

20       A.  In terms of the physical delivery, yes.  We

21   did receive boxes directly from House offices in

22   Mr. Michael's case, for example.

23       Q.  All right.  How about with Congressman

24   LaHood?  Have any come directly from the House to

25   the center?

1      A.  Yes.

2      Q.  All right.  And were others held privately

3  before -- the others held privately then before they

4  arrived or were delivered to the center?

5      A.  Yes.  In both Dirksen and the Velde case

6  they were held privately before their donation to

7  the center.

8      Q.  All right.  Through all of your education,

9  your experiences, your work as an archivist, have

10  you become familiar with what is sometimes referred

11  to as the customs and traditions of Congress?

12      A.  Yes, sir.

13      Q.  All right.  Is that a term of art with

14  respect to Congress?

15      A.  It is.

16      Q.  Was does it mean?

17      A.  It means that absent statutory definitions,

18  pattern and practice in terms of the managing of

19  congressional papers, that's the term of art used to

20  refer to that.  And you find it in almost all the

21  literature related to the management of

22  congressional collections.

23      Q.  Are you familiar with a publications known

24  as An American Political Archives Reader?

25      A.  Yes, sir.

MACKAMAN - DIRECT                    96

1    Q.  And are you familiar with someone named

2  Karin Dolly Paul?

3    A.  I am.

4    Q.  Who is Karen Dolly Paul?

5    A.  Karin Paul has been the archivist of the

6  United States Senate since 1982.  She and I began

7  our professional careers at about the same time.

8  Part of her responsibility is to advise sitting and

9  retiring members of the Senate on the maintenance of

10  files in their active office and on the disposition

11  of their files when they leave office.  In that

12  capacity she has written a records management

13  handbook for United States Senators and contributes

14  to the professional literature on the subject.

15  She's also, as the Dirksen Center, a co-founder of

16  the Association of Centers for the Study of Congress

17  and a member of the executive committee.

18    Q.  Do you know her personally?

19    A.  I do.

20    Q.  Do you know her background personally?

21    A.  Yes.

22    Q.  Is she someone you rely upon for information

23  when it comes to the handling of the papers and

24  records of former Congressmen and Senators?

25    A.  And more importantly Senators rely on her.

MACKAMAN - DIRECT                    97

1    I do as well.

2        Q.  I want to show you what's been marked as

3    Exhibit 10.  Do you recognize Exhibit 10?

4        A.  I do.

5        Q.  What is it?

6        A.  It's an article or a chapter in the reader

7    that you mentioned authored by Karin Paul entitled

8    Congressional Papers and Committee Records Private

9    Versus Public Ownership.

10       Q.  All right.  Have you read this?

11       A.  I have.

12       Q.  And in fact, did you make a copy from this

13   particular publication?

14       A.  I did.

15       Q.  And send it to me?

16       A.  I did.

17           MR. LANG:  At this time I would offer

18   Exhibit 10.

19           MR. BASS:  No objection, Your Honor.

20           THE COURT:  Admitted and so marked.

21       (Schock Exhibit 10 was admitted.)

22   BY MR. LANG:

23       Q.  All right.  Could you take a look at maybe

24   the second page of Exhibit 10, right on the front

25   page of Chapter 7 at the beginning.  It talks about,

MACKAMAN - DIRECT                    98

1   there's one sentence about archivists are.  What's
2   the second sentence say?
3       A.  "By custom and tradition, members of
4   Congress personally own and control the records
5   created and maintained in their own congressional
6   offices and these records are traditionally donated
7   to a research institution in their home state when
8   they depart Congress."
9       Q.  And do you know -- and does the next
10  sentence clarify that the Congressman and Senators
11  do not own the records of the committees on which
12  they serve; right?
13      A.  Yes, that's correct.
14      Q.  All right.  Could you turn to the next page.
15  And at the bottom of page 90, the last paragraph,
16  the opening sentence of that bottom paragraph on
17  page 90, does that discuss legislative proposals to
18  bring congressional records within the meaning of
19  public records?
20      A.  Yes, it does.
21      Q.  All right.  What did Congress choose to do?
22      A.  It chose not to define their records as
23  public records.
24      Q.  Could have, right?  They declared the --
25  they decided that presidential records ought to be

MACKAMAN - DIRECT                99

1    public records; right?

2        A.  Yes.

3        Q.  Congress specifically did not say that these

4    were the public records, they -- right?

5        A.  That's correct.

6        Q.  Had a chance to do it though, right?

7        A.  Yes.

8        Q.  And the next page, under private ownership,

9    it discusses what records are; right?

10       A.  Yes.

11       Q.  And is that basically consistent with what

12   you talked about in terms of the various types of

13   records that you've received from former members of

14   Congress?

15       A.  Yes.  Probably the only thing I would add is

16   that they're not form specific.  So it includes

17   electronic records, still photographs, audio

18   recordings, not just the paper record.

19       Q.  All right.  Last I'd ask you to flip back to

20   the back -- next to last page, 105.  Discusses some

21   remarks from a Congressman or two, in particular

22   Congressman Ehlers, right?  On March 5th, 2008?

23       A.  Yes.

24       Q.  Could you turn to the next page, which is

25   106, the last paragraph.  It says, "While

MACKAMAN - DIRECT                    100

1  congressional papers are the property and

2  responsibility of the member, the clerk in the House

3  and Secretary of the Senate stand ready to assist;"

4  right?

5      A.  Yes.

6      Q.  Is there any doubt in your mind from this

7  particular reference article that the books and

8  papers of a member of Congress are privately owned

9  by that member?

10     A.  I have no doubt that that is the case.

11     Q.  And that continues after they leave office,

12 doesn't it?

13     A.  Yes, it does.

14     Q.  All right.  Now, with respect to former

15 Congressman Schock, is the Dirksen Congressional

16 Center interested in a gift of the papers and

17 records of former Congressman Schock?

18     A.  We are, subject to some conditions.

19     Q.  And what's that?

20     A.  We would have to negotiate a mutually

21 satisfactory deed of gift.

22     Q.  Deed of gift?

23     A.  Yes, sir.

24     Q.  All right.  And has the center offered to

25 accept his papers and records under that condition

 1    that a formalized deed of gift be signed?

 2         A.  Yes, with respect to a particular group of

 3    records we have.

 4         Q.  Last, have you -- have what you've testified

 5    here to today been summarized in the form of a

 6    declaration?

 7         A.  Yes, sir.

 8         Q.  I want to show you what has been marked as

 9    Exhibit 4.

10         Well, I have Exhibit 4 here, Judge.  Let me use

11    the one I have marked up here; if we could

12    substitute a clean copy in a minute.

13         Showing you what has been marked as Schock

14    Exhibit 4.  Do you see that?

15         A.  I do.

16         Q.  What is that?

17         A.  It's a declaration which -- in which I state

18    my credentials, my experience, and my opinion about

19    the ownership of Congress member's papers.

20         Q.  All right.  Is it consistent with what you

21    testified to here today?

22         A.  Yes.

23              MR. LANG:  We'd offer Exhibit 4, Your

24    Honor.

25              THE COURT:  Any objection?

1          MR. BASS:  No, Your Honor.

2          THE COURT:  Exhibit 4 is admitted and so

3   marked as Schock Exhibit 4.

4       (Schock Exhibit 4 was admitted.)

5          MR. LANG:  Those are my questions, Your

6   Honor.

7          THE COURT:  Cross examination, Mr. Bass.

8                   CROSS EXAMINATION

9   BY MR. BASS:

10      Q.  I'm sorry, is it Mr. Mackaman?

11      A.  Yes, sir.

12      Q.  Mr. Mackaman, are you a lawyer?

13      A.  I am not.

14      Q.  And as I understand your testimony that

15   Mr. Lang asked you about -- multiple times about

16   whether there was any doubt in your mind.  You

17   essentially have said that as a non-lawyer, based on

18   your experience as put in Paragraph 5 of your

19   declaration, your testimony could be summarized in

20   that sentence, couldn't it?

21      "I'm aware that the papers and records of

22   individual members of Congress are personally owned

23   or controlled by them while they serve in Congress

24   and that the ownership continues thereafter unless

25   and until it's transferred, conveyed elsewhere?"

MACKAMAN - CROSS                    103

1       Would that sentence basically summarize what

2  you have testified to today?

3       A.  Yes, sir.

4       Q.  As a non-lawyer?

5       A.  Yes, sir.

6       Q.  And you've said that there's no doubt in

7  your mind to this fact.  And is that based on

8  because Congress has said so?

9       In other words, is there any other basis for

10  your no doubt belief that a member owns his paper

11  other than that Congress has said a member owns his

12  papers?  Is there any other source of information

13  for that no doubt conclusion other than that?

14      A.  Yes.  The Senate and House rules govern the

15  definition of records.  And by Senate and House

16  rules they define the non-personal or public records

17  specifically as committee records.  So by omission,

18  the non-committee records are personal records.

19      Q.  And that's based on what Congress has said

20  or not said?

21      A.  Yes, that's fair.

22      Q.  So the basis that we're talking about for

23  your no doubt conclusion is Congress -- what

24  Congress has said or not said, and that's it; right?

25      A.  It's also based on the experience of

1    archival repositories throughout the country with

2    which I'm familiar, if I take your question.

3        Q.  I understand that.  Archivists who receive

4    records from members of Congress or former members

5    of Congress, which has said the members own their

6    records; true?

7        A.  Congress has never said definitively

8    Congress members own their records.  They have said

9    by omission, it's -- they have only said that

10   committee records are public records and are to be

11   transferred to the custody of the National Archives

12   and Records Administration.

13       Q.  So is it the sole basis for your no doubt

14   conclusion not what Congress said, but what Congress

15   didn't say?

16       A.  Yes, that's -- yes.

17       Q.  And because of what Congress didn't say, the

18   regular practice of members have been to gift their

19   documents to archivists such as yourself?

20       A.  Yes.

21       Q.  Now, you don't, as a non-lawyer, have any --

22   you're not here to render any opinion or assert any

23   dispute that -- as to what the legal consequence of

24   what Congress doesn't say is?

25       A.  I am not an attorney.

 1      Q.  You agree with the proposition that it's
 2  emphatically the duty and obligation of the Court to
 3  say what the law is; right?
 4          MR. LANG:  Objection.
 5      A.  I'm not an attorney, so I don't have an
 6  answer.
 7      Q.  When you were -- were you elected to be
 8  mayor?
 9      A.  No.
10      Q.  You were appointed?
11      A.  I was.
12      Q.  And when you were mayor were you Frank
13  Mackaman d/b/a Frank Mackaman, or were you Frank
14  Mackaman, Mayor of Pekin?
15          MR. LANG:  Objection.  I don't know what
16  this has to do with anything.
17          MR. BASS:  Your Honor, I'm -- he's opened
18  the door to whether -- whether or not these records
19  are owned personally or are the records of a
20  representative.  I think I'm allowed a little
21  leeway.  I had no object to all these exhibits, I'd
22  ask for a little leeway just to expand on the scope
23  of what it is he's opining to.
24          MR. LANG:  I don't have any objection to
25  the scope of what he's opining to, but when we're

1     getting into his service as mayor.

2               MR. BASS:  I'll move on, I'll move on.

3               THE COURT:  All right.

4     BY MR. BASS:

5          Q.  The -- the Congress that you're familiar

6     with and rendered opinions about, are each of the

7     members that you talked about, including Mr. Schock,

8     former Senator Dirksen, former Representative

9     LaHood, were they elected members of Congress?

10         A.  Yes, they were.

11         Q.  Did any of them, Senator Dirksen, for

12    example, did he -- was his office every Dirksen

13    d/b/a Everett Dirksen or was it Senator Everett

14    Dirksen from Illinois?

15         A.  I don't understand the question.

16              MR. LANG:  And I object.  That's beyond the

17    scope of the direct.  And again, I believe he's

18    testified definitively that these were private

19    records, they came from Mrs. Dirksen, they didn't

20    come from some d/b/a and he's read the -- and

21    studied this for his career.

22              THE COURT:  Mr. Bass, how is this relevant?

23              MR. BASS:  Your Honor, they have given you

24    evidence of an opinion as to -- that the witness has

25    now said a representative owns the records because

 1   of what Congress didn't say.

 2       I think I'm allowed to develop for the record

 3   that the records that this witness has said are no

 4   doubt owned by the congressmen are in what capacity?

 5   Was it in his personal capacity, was it in his

 6   elected capacity?  Of what office?  Was it a

 7   representative office?  I think I'm allowed some

 8   leeway to inquire into the context of the opinion.

 9       I'm free to move on if Your Honor --

10           THE COURT:  Let's move on.

11   BY MR. BASS:

12       Q.  The -- when you say -- is it just the

13   records that you say are owned by the members or

14   former members?  Just the records alone?

15       A.  Well, I don't know how you are defining

16   records in that question.

17       Q.  Papers then?

18       A.  Well, it's not format specific.  So what I

19   mean by records are all of the non-committee

20   specific documents, photographs, oral recordings,

21   e-mails, social media, whatever it is, that a member

22   of Congress collects or deals with during her or his

23   time in Congress.

24       Q.  So they all relate to records as either a

25   representative of some district from some state or

1    as Senator from some state; would that be true?

2        A.  The -- typically a Congress member's papers

3    includes what you've just described, as well as

4    personal items.  So for example, some members of

5    Congress keep a personal diary.  That often comes to

6    a repository as part of the collection and it's

7    accessioned as one accession.

8        Q.  And all those or many of those records that

9    are generated, again, are they generated as part of

10   that person's duties as a Representative or Senator

11   from a state?

12       A.  Yes.  Generated by her or him or people in

13   contact with the office.

14       Q.  And are all these people public officials?

15       A.  No.

16       Q.  Are all members of Congress public

17   officials -- publically elected officials?

18       A.  Yes, except those that are appointed, I

19   assume, to fill out terms and not elected.

20       Q.  And do they all represent some state or

21   portion of a state?

22       A.  Yes, they do.

23       Q.  Do you know who pays for the records that

24   are generated?

25       A.  Yes.

MACKAMAN - CROSS                    109

1       Q.  Who's that?

2       A.  The taxpayer eventually.

3       Q.  And are all the members of the -- of

4  Congress, are they subject to -- on the House side,

5  House rules, standards of conduct, rules of ethics?

6       A.  Yes, sir.

7       Q.  They don't have any private autonomy

8  completely divisive from the House of

9  Representatives, do they?

10          MR. LANG:  I am going to object.  I don't

11  understand the question and we're out on relevance

12  here.  I don't understand why it's relevant, Judge.

13      Q.  So just to make clear then, you're here

14  today as a non-lawyer stating your opinion that

15  members of Congress own their papers because of what

16  Congress didn't do.  Is that right?

17          MR. LANG:  Asked and answered.

18      A.  Yes.

19          THE COURT:  Asked and answered, yes.  The

20  objection is sustained.

21          MR. BASS:  That's all I have.

22          THE COURT:  Anything further?

23          MR. LANG:  I don't believe we need to

24  clarify anything, Judge.  Thank you.

25          THE COURT:  Thank you, sir.

1      (The witness was excused.)

2          THE COURT:  And did I get a copy of

3    Exhibit 4.  Thank you.  Do we have Exhibit 4?

4          THE CLERK:  Yes.

5          THE COURT:  Okay, we do have Exhibit 4.

6      All right.  It's 4:00.  Do you need a break,

7    Kathy?

8          MR. LANG:  Sorry, are we breaking?

9          THE COURT:  No, I asked her if we needed a

10   break.

11     Your next witness?

12         MR. LANG:  Karen Haney.

13         THE COURT:  Mr. Lang, are any of these

14   witnesses who are still waiting from out of town?

15         MR. LANG:  Do we have other out of town

16   witnesses?

17         MS. EGAN:  Your Honor, we have Mr. Craig

18   Freeman who is here.  I'm not sure that in light of,

19   you know, the Court's earlier ruling, that it's

20   gonna be necessary to call Mr. Freeman.

21         THE COURT:  What about Mr. Kilgore?

22         MS. EGAN:  Mr. Kilgore is from out of town

23   and we do intend to call him.

24         THE COURT:  Well, it's 4:00.  We break at

25   4:30.

1           MR. TERWILLIGER:  Could we confer for a

2    second, Your Honor?

3           THE COURT:  Mm-hmm.

4      And also consider Mr. Coffield represents

5    certain of these witnesses.  Mr. Coffield -- why

6    don't we go off the record.

7      (A discussion was held off the record.)

8           THE COURT:  Back on the record.

9           MR. TERWILLIGER:  We're prepared to

10   exclude -- excuse, rather, Mr. LaHood, who is

11   Mr. Coffield's other client.  I think the Government

12   intends to call him about the issue of the so-called

13   missing computers.

14     As I indicated before, there's a totally

15   innocent explanation.  And even if there wasn't, I

16   don't think that has anything to do with this

17   so-called just cause hearing.  But I'm sure Mr. Bass

18   disagrees with me and may want to be heard on that.

19     But we -- if Mr. LaHood is here to testify

20   about what happened to those computers, we would

21   object on the grounds of relevance to this hearing.

22   I'd actually be pleased for Your Honor to hear that

23   story, but I don't think it has anything to do with

24   what's in front of us.

25           THE COURT:  Well, are you asking a

1   question?  Because we should put Mr. LaHood on next?

2           MR. TERWILLIGER:  No, the reason -- I'm

3   sorry, Your Honor.  The reason I'm asking is that if

4   Your Honor were to exclude as irrelevant to this

5   hearing the business about the so-called missing

6   computer and missing iPad, then Mr. Coffield could

7   go home because Mr. LaHood would not be needed to

8   testify.

9           THE COURT:  Except representing --

10          MR. TERWILLIGER:  After Ms. Haney, right.

11          THE COURT:  Mr. Bass, I assume you find

12  missing computers relevant?

13          MR. BASS:  I do, Your Honor.  But I

14  guess -- I don't want to ask for an advisory

15  opinion, but just to state what our position is.

16      I think I've articulated now many times that we

17  are not -- we've agreed that we are not seeking

18  records in the campaign office for the campaign to

19  reproduce from within the campaign office in Peoria

20  that which has been seized.

21      We are seeking to hold Mr. Schock in contempt

22  for failure to produce other campaign records,

23  specifically those in his personal possession, which

24  we've presented some evidence about.

25      In that vein, it might be relevant; and I don't

1  know -- again, I don't know what Your Honor's view

2  of relevance is; but it might be relevant --

3          THE COURT:  Are you questioning my view of

4  relevance?

5          MR. BASS:  It could be relevant for Your

6  Honor to know to what degree did Mr. Schock exercise

7  control over these records and were there

8  potentially responsive records on a computer, a

9  campaign purchased computer that was in his

10  congressional office that we're prepared to present

11  evidence to establish that he directed someone to

12  remove it from his congressional office and

13  ████████████████████████████████████████████████

14  effect.

15      I'm more than willing to agree to a stipulation

16  ████████████████████████████████████████████████

17  is what Mr. Kircher has indicated Mr. LaHood has

18  said before.

19      But in the absence of a stipulation, in the

20  absence of knowing the extent of what Your Honor's

21  view about relevance, I think that's a relevant -- a

22  relevant issue to establish to what extent did

23  Mr. Schock exercise control over the campaigns and

24  campaign assets during the time that you ordered him

25  to produce those records.

1          MR. TERWILLIGER:  Two quick points, if I

2     may, Your Honor.

3          One, the Government has that computer, so

4     there's no issue about any spoliation of evidence or

5     anything of that sort.  They now have it.

6          Secondly, to the extent that it -- Mr. Bass is

7     proffering it for the basis that it goes to

8     Mr. Schock's control of records, I think one,

9     when -- if you were to hear the testimony, it

10    wouldn't bear on that to anywhere near the degree of

11    a lot of other things you've heard.  It's sort of

12    irrelevant and doesn't seem to me to be the basis to

13    hold a witness over for that one issue.

14         And second, it's irrelevant, because this --

15    the purpose of this hearing is just cause

16    prospectively.  Mr. Bass just said he wants to prove

17    that Mr. Schock did something three weeks ago that

18    was, in his position, contumacious.  If the

19    Government has the computer; and that issue, which

20    was never raised in all of this until, if you

21    recall, the eleventh hour; respectfully, Your Honor,

22    it just doesn't have anything to do with what's in

23    front of you now.  And I respectfully submit would

24    be a waste of both judicial and private resources.

25         But if you want to hear it, you know, then I

1    guess we will.

2    ████████████████████████████████████

3    ████████████████████████████████

4    ████████████████████████████████████

5    ████████████████████████████████

6    Mr. Kircher's letter is obviously incomplete because

7    all Mr. Kircher said was, this computer was on the

8    records and we didn't find it.

9        Well, we found it, there's an explanation for

10   where it is, it's quite innocent and it went

11   immediately to the Government.  It just -- it really

12   is overkill and has nothing to do with anything in

13   front of you, Your Honor.

14            THE COURT:  Well, there's no doubt that

15   Mr. Bass is thorough, if nothing else.

16       I didn't mean that as an insult, I meant it as

17   a compliment.

18       But the bottom line is, Mr. Coffield, if we can

19   get Mr. LaHood on to testify -- well, we'd have to

20   get both of them on though and I don't think we can

21   do both.

22            MR. BASS:  I don't know what --

23            MR. TERWILLIGER:  May I?  Sorry.

24            MR. BASS:  Sure.

25            MR. TERWILLIGER:  Maybe as we stand here

1    today, if Mr. Bass wants to proffer what Mr. LaHood

2    would actually say, if that comports with what we

3    understand the facts to be, we can get past this

4    issue.

5            MR. BASS:  I'm happy to proffer that, what

6    I would expect him to testify to, if there's no

7    objection.

8            MR. TERWILLIGER:  That you would proffer?

9            MR. BASS:  Yes.

10            MR. TERWILLIGER:  Yeah, I have no objection

11   to that.

12            MR. COFFIELD:  Your Honor, should I have

13   the witness step out?

14            MR. BASS:  Yes, please.

15            THE COURT:  I didn't know he was in here.

16   Or she was in here.

17            MR. BASS:  Your Honor, you have of record

18   what Mr. Kircher advised Mr. Terwilliger and I as to

19   what House counsel's interview of Mr. LaHood and

20   Mr. Rudolph revealed.

21       Mr. -- I would expect Mr. LaHood to testify

22   that he had possession -- after Your Honor's order,

23   he had possession of a Macintosh computer, an Apple

24   computer, in his possession at the congressional

25   office, which was paid for by campaign funds.

1          That computer was previously used by Mr. Link,

2     Jonathan Link, who was -- who did photography work

3     for Mr. Schock, and that there -- the computer was

4     primarily used for storing videos and pictures.

5     Including videos and pictures of Mr. Schock's

6     travel, which is a subject matter raised in the

7     subpoena.

8          I would expect Mr. LaHood to testify that he

9     expressed a desire to pay to purchase that campaign

10    paid for computer --

11              THE COURT:  Who is he?

12              MR. BASS:  Mr. LaHood.  Mr. -- I would

13    expect that he would testify Mr. LaHood expressed an

14    interest to Mr. Schock to purchase that computer,

15    which he never did.

16         And that in -- sometime in mid-April, after

17    Your Honor's April 9th order, he had a conversation

18    with Mr. Schock where they discussed this possible

19    purchase.  And Mr. Schock directed him, allowed him,

20    approved of him to remove the computer from the

21    congressional office and take it home.

22         I would expect that he would testify that he

23    didn't tell anybody about that.  Didn't tell the

24    Government about that.

25              THE COURT:  Are you saying LaHood or

1    Schock?

2         MR. BASS:  Mr. LaHood didn't tell anybody

3    about that.  He didn't tell the Government about it

4    ██████████████████████████████████████████████████

5    ████████████████████████████████████████

6    anybody about it until he was asked about it by the

7    Government after they had received the letter from

8    Mr. Kircher.

9         And I would expect that he would testify that

10   the Government would not have known about the

11   existence of that computer or its contents but for

12   Mr. Kircher's letter.

13        I would expect that he would further testify

14   that after the Government contacted Mr. Coffield,

15   Mr. LaHood's attorney, and Mr. Bopp, the campaign

16   entities' attorney, that it was agreed that

17   Mr. LaHood would bring the computer to the campaign

18   office and that the computer would be turned over to

19   the Government, which is what occurred.

20        And that is the extent of what I would expect

21   Mr. LaHood to testify to.  I would -- we have

22   another witness who's examined that computer who

23   will be able to testify to what its contents are.

24   And I can proffer that as well.  But that would be

25   the extent of what I would expect Mr. LaHood to

1    testify to.

2           MR. TERWILLIGER:  Your Honor, I don't know

3    whether Mr. Bass would be agreeable to this, but the

4    only thing I would add to that, but it's a very

5    important material fact, is that it was Mr. LaHood

6    who suggested to Mr. Schock that he remove the

7    computer from the office so that Mr. Link would not

8    take it.  And that Mr. LaHood preserved the

9    computer; that he didn't do anything to alter it.

10   And as far as he knew, it only contained videos,

11   which apparently this next witness could testify to.

12       If Mr. Bass has no objection to that additional

13   fact, which we anticipate Mr. LaHood would testify

14   to, I think what Mr. Bass related to the Court could

15   be stipulated to.

16           THE COURT:  Is that acceptable?

17           MR. BASS:  Your Honor, I know that he

18   ██████████████████████████████████████████

19   between Mr. -- Mr. LaHood testified there was

20   discussion between him and Mr. Schock about the

21   removal of the computer by Mr. LaHood to his home.

22   ████████████████████████████████████████████

23   ██████████████████████████████████████████

24   of who suggested it first.

25       But I would stipulate that there was a

1    discussion between the -- he would testify there was

2    a discussion between them about the removal.

3    Whether it was at Mr. LaHood's initiative or

4    Mr. Schock's, I'm not sure, I don't know that

5    it's --

6            MR. TERWILLIGER:  Well, I think that

7    obviously makes a difference, Your Honor.  And maybe

8    we just have to take his testimony.

9            MR. BASS:  If I may -- if I could have a

10   minute to review something?

11       Your Honor, I think we will be able to reach a

12   stipulation where we can excuse Mr. LaHood.  I would

13   ████████████████████████████████████████████████

14   Mr. Schock directed him to remove the computer for

15   the purpose of avoiding the subpoena.  There was

16   discussion about removal of the computer.  I'm just

17   ████████████████████████████████████████████████

18   as to the precise sequence of that and what exactly

19   was said.

20       But I'm not proffering that there was a

21   discussion between Mr. LaHood or Mr. Schock where

22   Mr. Schock initially directed Mr. LaHood to remove a

23   computer expressly stating to do so to hide

24   evidence, if that is --

25           MR. TERWILLIGER:  You know, our position

1    still is, Your Honor, that this testimony is not

2    relevant to anything in this hearing.  But Your

3    Honor can determine that and give it what weight or

4    not that it might merit.

5        I'm trying to reach a stipulation so that we

6    can at least, for the sake of witness --

7            MR. BASS:  And I'm willing to proffer it --

8    when I get to it here, Your Honor, proffer exactly

9    what it is he would testify to and we can excuse

10   him.

11           THE COURT:  All right.

12       Do you want to send somebody out to tell

13   Mr. LaHood he is excused.  Oh, Mr. Coffield, you

14   can't sit behind my computer.

15           MR. LANG:  Judge, I expect Ms. Haney to

16   take about ten minutes on direct.

17           THE COURT:  Well, in ten minutes it will be

18   4:30.

19           MR. TERWILLIGER:  Your Honor, we're gonna

20   proceed, but would the Court excuse Mr. Schock for

21   just a moment?

22           THE COURT:  Sure.

23       (The witness was sworn.)

24           THE COURT:  Mr. Coffield, since you

25   represent this client, do you wish to be seated up

1    here?

2              MR. COFFIELD:  That would be great, Your

3    Honor.  Thank you.

4              THE COURT:  And if you have any objections

5    or wish to confer with your client, simply

6    interrupt.

7              MR. COFFIELD:  Thank you, Your Honor.

8              THE COURT:  Please proceed.

9              MR. LANG:  Thank you, Judge.

10                   KAREN HANEY

11   called as a witness herein, having been duly sworn,

12   was examined and testified as follows:

13                 DIRECT EXAMINATION

14   BY MR. LANG:

15        Q.  Would you please state your full name?

16        A.  Karen Haney.

17        Q.  And how do you spell your last name?

18        A.  H-a-n-e-y.

19        Q.  In what city do you reside?

20        A.  Peoria.

21        Q.  And are you employed?

22        A.  Yes.

23        Q.  And what do you do?

24        A.  I'm the political director for Schock for

25   Congress.

1      Q.   And what's Schock for Congress?

2      A.   It's the principle/primary campaign

3  committee to elect Aaron Schock to Congress.

4      Q.   When you say the principle committee, are

5  there other committees affiliated with the Schock

6  for Congress committee?

7      A.   There are.

8      Q.   And could you tell the Court what some of

9  those are?

10      A.   Sure.  There's GOP Generation Y, which is a

11  leadership PAC.  There's Schock Victory, which is a

12  joint fundraising committee.

13      Q.   All right.  So three?

14      A.   There's a fourth one that we don't directly

15  control, 18th District Committee.

16      Q.   All right.  How long have you worked in this

17  office, the Schock for Congress office or committee?

18      A.   Since October of 2013.

19      Q.   October 2013, okay.  What are your current

20  duties?  And I'm gonna talk about a couple different

21  time markers in timeline, but as of today, as you

22  sit here today, what are your duties?

23      A.   Essentially paying bills, ensure that FEC

24  compliance reports are correct and filed as needed,

25  reconcile bank accounts.  Pack up some stuff.

1        Q.   Expenditure records, things like that?

2        A.   Absolutely.

3        Q.   Balancing the checkbook?

4        A.   Yes.

5        Q.   Do you write checks?

6        A.   Yes.

7        Q.   Now, I want to talk about -- well,

8    Congressman Schock resigned effective March 31st,

9    2015; correct?

10       A.   Yes.

11       Q.   Did that change your life at all?

12       A.   Absolutely.

13       Q.   All right.  What were your duties before

14   March 31st, 2001?

15       A.   It depended on the month and the day.  Do

16   you want me to speak generally?

17       Q.   Generally, we'd like for you to describe for

18   the Court what your day, work -- day week was like

19   working before March 31st, 2015?

20       A.   Okay.  Well, one important aspect was

21   bookkeeping.  So like I just mentioned, the current

22   duties that I have I also did previously.  Making

23   sure every cent that came into the campaign office

24   and went out of the campaign office was accurately

25   and precisely reported.

1          In addition to that, assist with small

2     fund-raisers, help organize and put on larger

3     fund-raisers.  Plan participation in numerous

4     parades if it was the summer months.  Donor

5     relations.

6          Oh, oversee records for our fundraisers,

7     separate fundraisers in DC and also in Chicago.

8     Interact with them on an almost weekly basis.

9          Q.  All right.  I'd like to focus on the -- you

10    mentioned bookkeeping as part of your duties?

11         A.  Yes.

12         Q.  Could you tell the Court the kind of

13    bookkeeping activities you were doing before

14    March 31st?

15         A.  Sure.  There's a lot that's required when it

16    comes to reporting in terms of campaign money,

17    right?  So to start from the beginning, if I were to

18    get a bill, a bill comes into the office, I would

19    write a check for that bill, process it through our

20    QuickBooks system, put it in the checkbook, send it

21    off to PDS along with a copy of the invoice

22    corresponding with that bill.

23         Q.  Okay.  How about income?  Income to the --

24         A.  Yeah, absolutely.  So income was the same

25    with the -- when it had to do with deposits.  Many

1    times, because we have to have certain information

2    collected from our donors to complete the FEC

3    reports, that we would have to complete that

4    information or try to fill in the blanks and track

5    that information ourselves.

6        And we also kept a lot of spreadsheets to track

7    how much was made at which fundraising event, who

8    donated to what, which committee, et cetera.

9        Q.   All right.  Now, you talked about all these

10   different recordkeeping functions.  Were you

11   personally involved in generating those records?

12       A.   Yes.

13       Q.   Keeping those records?

14       A.   Yes.

15       Q.   Filing those records?

16       A.   Yes.

17       Q.   Organizing them?

18       A.   Yes.

19       Q.   Now, let's talk about your organization of

20   records.  I want you to give yourself a report card.

21   How organized you were?  Like my desk over there is

22   messy.  And there's stuff all over my desk in my

23   office is messy.  Tell the Court, I'd like for the

24   Court to have a picture of how organized you are.

25       A.   So I should probably be on medication for

1    obsessive compulsive disorder, because I keep every

2    record that comes in to the office.  Everything --

3    there was a filing system that was in place before I

4    came in to work and so I kept up that file system

5    and added some additional stipulations in terms of

6    my own filing.

7         Because I knew ultimately I was going to have

8    to answer if anyone had a question about records.

9    So I wanted to be able to access them in short

10   notice.

11        So every event had a separate binder, every

12   month had a separate folder for expenditures

13   versus -- expenditures and receipts versus

14   donations.  And each committee had a separate drawer

15   where all of those were kept.  So...

16        Q.  So give yourself an A then?

17        A.  Give myself an A.

18        Q.  All right.  The campaign office, where was

19   that located?

20        A.  Junction City Shopping Center in Peoria.

21        Q.  Okay.  Do you remember the address?

22        A.  5901 Prospect Road.

23        Q.  Okay, that's fine.  I want to show you

24   what's been marked as Exhibit 28.  Do you recognize

25   what's depicted in the photograph Exhibit 28?

1    Schock Exhibit 28?

2         A.  Yes.

3         Q.  What is that?

4         A.  It's a picture of an office building that

5    hosts Aaron Schock's campaign office, in addition to

6    several other businesses.

7         Q.  Do you see one business in particular that

8    was the Aaron Schock U.S. Congress office?

9         A.  Yes.

10             MR. LANG:  All right.  I'd offer

11   Exhibit 28, Your Honor.

12             THE COURT:  Any objection?

13             MR. BASS:  No objection, Your Honor.

14             THE COURT:  28 is admitted and so marked.

15        (Schock Exhibit 28 was admitted.)

16   BY MR. LANG:

17        Q.  This Aaron Schock office, if you look at

18   that -- when you looked at that exhibit -- here, I

19   can show it to you again.  Next to the placard is a

20   door; correct?

21        A.  Yes.

22        Q.  And is that the main door?

23        A.  Yes.

24        Q.  And how big was that office; can you

25   describe it for the Court?  How many square feet,

1    how many rooms?

2          A.   The best estimate I got was around

3    700 square feet.

4          Q.   How many desks were in that office?

5          A.   There were four desks.   There's a small

6    conference room that has an eight foot conference

7    table, my desk in a separate room, two desks in

8    another room and then a small lobby area.

9          Q.   All right.   After March 31st, 2015, when

10   Congress Schock's resignation was effective, he was

11   done, how many employees were there of the campaign?

12         A.   Two.

13         Q.   All right.   And who were they?

14         A.   Myself and Shea Ledford.

15         Q.   Did Mr. Ledford work from that office?

16         A.   Occasionally.

17         Q.   Did you work from that office?

18         A.   Yes.

19         Q.   And after March 31st, 2015, were you there

20   on a daily basis?

21         A.   For a couple weeks.

22         Q.   All right.   Were the records -- you've

23   talked about Schock for Congress, but you also

24   mentioned these other entities.   Were the other

25   entities, the other campaign entities' records also

                              HANEY -  DIRECT                    130

 1    kept in that office?

 2         A.  Yes.

 3         Q.  Based on your work there, based on going

 4    there, were you familiar with all the records that

 5    were kept there in that office?

 6         A.  Most of them.  I didn't have them memorized,

 7    but generally speaking I knew what was where.

 8              THE COURT:  Excuse me for interrupting.  I

 9    received a note from one of my clerks that Lee Smith

10    called and that he represents Ventura Merna?

11              MR. BASS:  Carol Merna.

12              THE COURT:  Carol Merna.  And he's waiting

13    across the street and is she going to be called and

14    will it be today?

15              MR. BASS:  It wasn't my subpoena, it was

16    their's.

17              MS. EGAN:  No, Your Honor, she's not going

18    to be testifying today.

19              THE COURT:  Will she be testifying

20    tomorrow?

21              MS. EGAN:  We'll excuse her.

22              THE COURT:  You'll excuse her?

23              MS. EGAN:  Yes.

24              THE COURT:  So if I have my clerk call

25    Mr. Smith back, I have your assurance she won't be

1    called?

2              MS. EGAN:  Yes.

3              THE COURT:  All right.  I went to law

4    school with Mr. Smith and Mr. Smith used to work

5    with the U.S. Attorney's Office for many years.

6        And your 15 minutes are up.

7              MR. LANG:  Okay, I'm getting close, sir.

8              THE COURT:  Actually they were ten minutes.

9    BY MR. LANG:

10       Q.  The records of the other entities were kept

11   there as well?

12       A.  Yes.

13       Q.  All right.  As of March 31st, 2015, as far

14   as you knew were all the original records of the

15   campaign and the campaign entities kept there at

16   that office?

17       A.  To my knowledge, yes.

18       Q.  All right.  Were there times when other

19   records -- when copies were sent out to other people

20   or other entities?

21       A.  Yes.

22       Q.  Did you have to do that as part of your job?

23       A.  Yes.

24       Q.  All right.  For example, were the FEC

25   filings, did that require you to send records

HANEY - DIRECT                    132

1    somewhere?

2          A.  Yes.

3          Q.  All right.  Did you send the original

4    records, the only copies of which existed?

5          A.  Absolutely not.  I would scan copies of the

6    original documents into an e-mail and send them

7    directly to PDS, or whoever it was who was

8    requesting a document.  But the originals always

9    stayed in the office.

10         Q.  Always?

11         A.  Yes.

12         Q.  Did -- for example, did members of

13   Congressman Schock's staff ask for copies of records

14   on occasion?

15         A.  On occasion, yes.

16         Q.  And did you ever send them original records?

17         A.  No.

18         Q.  Did Congressman Schock ever ask you for

19   copies of records?

20         A.  On occasion, yes.

21         Q.  Did you ever send to him the only existing

22   copy of the record in the campaign office?

23         A.  No.

24         Q.  Were original campaign records, records of

25   these entities, the originals, every kept anywhere

1    other than the office that you just described?

2        A.  Not to my knowledge.

3        Q.  You would know, right?  You ran that office,

4    right?

5        A.  Since October of 2013.

6        Q.  Yes.  So is it fair to say there were no

7    non-duplicative records of these campaign entities

8    kept anywhere else?

9        A.  Yes.

10       Q.  All right.  Did there come a time when you

11   learned a Grand Jury subpoena had been issued to the

12   campaign entities?

13       A.  Yes.

14       Q.  Was it served on you?

15       A.  No.

16       Q.  Did you ever see them?

17       A.  No.

18       Q.  See it?

19       A.  No.

20       Q.  Did you come to learn, have an understanding

21   of what was to be produced under the Grand Jury

22   subpoena or subpoenas?

23       A.  Eventually, generally.

24       Q.  What was your understanding of what was

25   required to be produced under the Grand Jury

1   subpoena?

2        A.  In terms of the campaign office?

3        Q.  Yes?

4        A.  Mostly everything.

5        Q.  Mostly everything having to do with the

6   campaign entities?

7        A.  That was my understanding.

8        Q.  All right.  Did you become involved at all

9   in responding to the subpoena?

10        A.  I assisted who eventually would be the

11   attorney for the PACS in identifying where files

12   were located and such.  So yes.

13        Q.  All right.  So in the 700-square-foot office

14   somebody -- an attorney came in to pull the

15   documents to be produced under the Grand Jury

16   subpoena; right?

17        A.  Yes.

18        Q.  And you assisted; right?

19        A.  Yes.

20        Q.  Did you have to be told to assist this

21   person?

22        A.  No.

23        Q.  You just did it, you were there; right?

24        A.  Yes.

25        Q.  All right.  You didn't have to get a phone

1    call from Aaron Schock or something saying, you do

2    this, did you?

3         A.  No.

4         Q.  But you helped?

5         A.  Yes.

6         Q.  Did you -- did there come a time when

7    records were pulled and readied for production to

8    the Government?

9         A.  I believe so, but if you elaborate just so I

10   know what we're talking about.

11        Q.  All right.  Did this attorney, or with your

12   help did whoever was there with this attorney, pull

13   some documents and start getting them together to be

14   produced for the Government?

15        A.  Yes.  Many banker -- dozens of bankers boxes

16   were prepared.

17        Q.  All right.  Did you help with that?

18        A.  Yes.

19        Q.  All right.  And what was to be done with

20   those boxes of -- bankers boxes?

21        A.  It was my understanding they were being sent

22   off to a local copying/printing business that was

23   going to scan them and then put them on thumb drives

24   for purposes of responding to the Government's

25   subpoena.

1          Q.  Did you make those arrangements?

2          A.  I didn't make them personally, no.

3          Q.  Okay.  But that -- so there were these dozen

4     boxes or whatever with records; right?

5          A.  Yes.

6          Q.  And did they go out the door?

7          A.  Yes.

8          Q.  Were you there when they went out the door?

9          A.  Yes.

10          Q.  And what happened?  How did they go out the

11    door?

12          A.  In a car.

13          Q.  Who picked them up or who got them or

14    whatever?

15          A.  Yeah, someone from the business.  I don't

16    recall the exact -- I think it was Speedy Printing

17    or Quick Printing came and collected them and I was

18    there to help load them up.

19          Q.  All right.  So you helped load them up and

20    off they went; right?

21          A.  Yes.

22          Q.  All right.  Did there come a time after that

23    when federal agents were at the office?

24          A.  Yes.

25          Q.  All right.  And directing your attention to

HANEY -  DIRECT                    137

1    June 4th, 2015, does that sound familiar?

2        A.  Yes.

3        Q.  As of June 4th, let's say June 3rd, as of

4    June 3rd, were all of the original records of the

5    campaign, except for those 11 or 10 or dozen boxes,

6    whatever they were, were all the records of the

7    campaign there at that office?

8        A.  Yes.

9        Q.  Now, agents showed up and executed a search

10   warrant on June 4, 2015; right?

11       A.  Yes.

12       Q.  And were you there at the time?

13       A.  I was.  I showed up after I learned of the

14   search warrant.

15       Q.  Okay.  Well, that's my question.  The

16   agents -- you learned that there were agents at the

17   office; right?

18       A.  Yes.

19       Q.  You got a phone call, I assume?

20       A.  Yes.

21       Q.  All right.  Did you go there?

22       A.  Yes.

23       Q.  And what did you see?

24       A.  I saw, I would be guessing, maybe a dozen

25   federal agents outside the office.  And was met near

1    my car by one of the agents who I had come to know

2    through my Grand Jury testimony.  And the door to

3    the office was open.

4         Q.  It was already open when you got there?

5         A.  Yes.

6         Q.  Do you know how they got in?

7         A.  I asked.  And they indicated that someone

8    from the facility had given them a key.  Or opened

9    the door for them.

10        Q.  All right.  So they were -- already had the

11   door open when you got there; right?

12        A.  Yes.

13        Q.  And did you go inside?

14        A.  I did eventually.

15        Q.  All right.  Let's back up to when you first

16   got there.  Did anybody show you a search warrant?

17        A.  Yes.

18             MR. BASS:  Your Honor, I'm happy to go into

19   all this, to re-present to you the basis for the

20   search warrant and why we sought it, but we're gonna

21   be here all day tomorrow.  I don't understand what

22   the relevance of this has to do with just cause for

23   Aaron Schock refusing to comply with your order.

24        So I just have I guess an objection to how far

25   of a door we're opening here.

1          MR. LANG:  Well, I'm glad he asked that,

2     Judge, because impossibility is one of the absolute

3     defenses in -- to civil contempt.  And the witness

4     is going to discuss what was taken at the search

5     warrant and through the search warrant and what was

6     left there after the search warrant.

7       And so that's the reason we're going through

8     this.  I'm simply going to have her identify that

9     the search warrant called for a very broad array of

10    records and that they were seized.

11         THE COURT:  You have now had 25 minutes and

12    I have to be somewhere at five.

13      Mr. Coffield, do you have an ability to return

14    tonight?

15         MR. COFFIELD:  Do I have an ability to

16    return tonight?

17         THE COURT:  Do you have a flight?  Are

18    there flights?

19         MR. COFFIELD:  Your Honor, I'm pleased to

20    do whatever the Court wants to do.

21         THE COURT:  I know you are, but I'm asking.

22         MR. COFFIELD:  I've got an ability to get

23    an 8:00 flight, but right now that's looking dim.

24         THE COURT:  All right.  Thank you.

25         MR. BASS:  Again, recognizing that this

1    entire proceeding and the record of this proceeding

2    is now public, so I just want to make sure that

3    counsel for Mr. Schock are still in agreement that

4    this entire proceeding is public.

5              MR. LANG:  Judge, the whole world knows

6    there was a search warrant executed at Mr. Schock's

7    office.

8              MR. BASS:  Fine.  No objection, Your Honor.

9              MR. LANG:  The media was waiting.  May I

10   continue?

11             THE COURT:  Hm-mm.

12   BY MR. LANG:

13      Q.  Did the agents go in and seize things to

14   your knowledge?

15      A.  Yes.

16      Q.  All right.  And to speed it up, you went in

17   a couple of times to help them access storage

18   devices -- storage locations?

19      A.  Correct.

20      Q.  On two different -- they didn't let you

21   inside, leave you inside while they did their

22   searching, did you?  Did they?

23      A.  I was escorted in and out.

24      Q.  A couple times?

25      A.  Yes.

HANEY - DIRECT                    141

1    Q.  For the purpose of accessing a locked -- one

2  locked area and viewing another; right?

3    A.  Yes.

4        THE COURT:  Let me ask, were the documents

5  that were taken to Speedy or Quick Copying returned

6  before the agents arrived?

7            MR. LANG:  No.  We'll get to that.

8            THE COURT:  Okay.

9  BY MR. LANG:

10    Q.  At some point did you learn that the agents

11  wanted additional -- became aware of additional

12  boxes of records?

13    A.  Yes.

14    Q.  All right.  And what did they tell you and

15  what did you do?

16    A.  I don't recall exactly what they told me.  I

17  think they may have worked through my attorney on

18  that.  But I know ultimately I called the place

19  where we -- in front of the FBI agents, where we had

20  the documents to be scanned, offered either for the

21  FBI to go pick them up or the business offered to

22  bring those back.

23    Q.  All right.  Did they offer to bring them

24  back?

25    A.  Yes.

1      Q.  Did they bring them back?

2      A.  Yes.

3      Q.  And do you know how many boxes they brought

4  back?

5      A.  Eleven.

6      Q.  All right.  Did you get to see those boxes?

7      A.  Yes.

8      Q.  And were they the same boxes as you had

9  boxed up -- helped box up a couple days earlier?

10     A.  Yes.

11     Q.  Same records?

12     A.  Yes.

13     Q.  All right.  So the agents took those?

14     A.  Yes.

15     Q.  Did they also take records from in the

16  office?

17     A.  Yes.

18     Q.  All right.  I'm gonna quickly offer Exhibits

19  25 and 26, Your Honor, which are the inventories of

20  all the documents, the records that were seized.  Is

21  that without objection?

22          MR. BASS:  No objection, Your Honor.

23          THE COURT:  25 and 26 are admitted and so

24  marked.

25      (Schock Exhibits 25 and 26 was admitted.)

1    BY MR. LANG:

2         Q.  All right.  25 and 26.

3         So the -- with respect to Exhibit 25, you've

4    seen this inventory; right?

5         A.  Yes.

6         Q.  And were you provided with this inventory?

7         A.  Yes.

8         Q.  It's got your name on it.  And I talked

9    about Exhibit 25.

10        Exhibit 26 says eleven bankers boxes, records,

11   and then it says responsive for subpoena to the

12   PACs, whatever that means.  But you received this as

13   well too, didn't you?

14        A.  Yes.

15        Q.  Your understanding was this was the receipt

16   for the eleven boxes, the Exhibit 25, the two page

17   typed receipt was for all the other things that the

18   agents seized; right?

19        A.  Yes.

20        Q.  All right.  Let me ask you this; did you go

21   back to the office when the agents were done?

22        A.  The next day.

23        Q.  All right.  Well, was the office locked up?

24        A.  Yes.

25        Q.  How do you know that?

HANEY - DIRECT                          144

1          A.  Well, I asked the agents if they could lock

2     the office up and offered them my key.

3          Q.  All right.  Did they do it as far as you

4     know?

5          A.  As far as I know, yes.

6          Q.  You relied on the FBI to lock up your space;

7     right?

8          A.  Well, they got in.

9          Q.  All right, Understood.

10         You went back the next day?

11         A.  Yes.

12         Q.  Did you look around?

13         A.  Yes.

14         Q.  Did you look to see what had been taken?

15         A.  Of course.

16         Q.  And did you look to see what was still

17    there?

18         A.  Yes.

19         Q.  You had an understanding that the Grand Jury

20    subpoena required all -- basically all the records

21    of the campaign entities; right?

22         A.  Yes.

23         Q.  When you did your review of what had been

24    taken, did you see any records left there that were,

25    based on your understanding, had something to do

HANEY - DIRECT                    145

1   with campaign entities and needed to be submitted to

2   the Grand Jury?

3         A.  No.

4         Q.  How thoroughly did you look?

5         A.  Well, pretty thoroughly, although it wasn't

6   that difficult because the entire file cabinets were

7   gone, so there wasn't a whole lot to look through.

8               MR. LANG:  All right.  Those are my

9   questions.

10              THE COURT:  Mr. Bass, how many questions

11  are you going to need to ask?

12              MR. BASS:  Well, in light of that direct,

13  Your Honor, and your need to leave by five, I can't

14  commit to be done by five, but I'll go as far as

15  Your Honor allows me.

16              THE COURT:  We have to get across town by

17  five.

18              MR. BASS:  If you wish, Your Honor --

19              THE COURT:  I'm gonna go ahead and excuse

20  my court reporter and record this electronically at

21  this point.

22        (A discussion was held off the record.)

23              THE COURT:  Mr. Coffield, I hate to do this

24  to you, we're not gonna be done by 5:00.  I said we

25  were gonna be done by 4:30.

1          MR. COFFIELD:  I had a sense this was going

2     this way at about 3:30, Your Honor.

3          THE COURT:  All right.  We're gonna recess

4     at this time, Mr. Bass.  I apologize to you, Ms.

5     Haney.

6       We will reconvene in the morning at 9:00.

7       (Court was recessed for the day.)

8     I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

9     Reporter, certify that the foregoing is a correct

10    transcript from the record of proceedings in the

11    above-entitled matter.

12

13

14

15

16                   This transcripts contains the

17                   digital signature of:

18

19                   Kathy J. Sullivan, CSR, RPR, CRR

20                   License #084-002768

21

22

23

24

25